### ROWLAND *VS.* LADIGA.

1. The title of an Indian reservee to his improvement, did not vest, under the treaty with the Creek tribe, until the reservee was located by the agent of the United States.

Error to Benton Circuit court.

Trespass to try title, tried before *Booth*, J.

Defendant in error brought her action of trespass, to recover a half section of land, which she claimed as her reservation, under the treaty with the Creek tribe of Indians, of the 24th March, 1832. Defendant demurred to the declaration, and also plead the general issue. Defendant exhibited in evidence, a patent from the United States, for the land in question. Verdict and judgment for the plaintiff below.

On the trial, the court charged, that " if plaintiff was the head of a family at the time of making the treaty, and entitled to her reservation, as such, which reservation included her improvement, (the land sued for,) the patent passed nothing, the title having vested in her by operation of the treaty, of which she could not be divested by any subsequent act of the United States government, or its agents."

This charge of the court was assigned for error.

*Cochran,* for plaintiff in error.
*Martin,* contra.

GOLDTHWAITE, J.—The omission to state in the

bill of exceptions, such of the facts in evidence before the jury, as might enable this court to determine the propriety of the instructions requested, prevents us from expressing any opinion on them,—nothing being shown to relieve them from the character of mere abstract propositions.

In this position of the case, we should, so far as the bill of exceptions is concerned, deem it our duty to decline any response to the questions presented, if the Circuit court had not also stated an affirmative charge, as well as its refusal to give the particular one demanded. This refers to that part of the bill of exception, which informs us that the Circuit court "charged the jury, if the plaintiff was the head of a family at the time of making the treaty, and entitled to her reservation as such, which reservation included her improvement, (the land sued for,) then, the patent passed nothing, the title having vested in her by operation of the treaty, of which she could not be divested by any subsequent act of the United States government, or its agents." This charge enables us to review its correctness, in conformity with the rule laid down in the case of Pedin vs. Moore, (1 Stew. & Por. 71;) though it would have been more satisfactory if the evidence was disclosed, as greater precision might then be given to the decision, than can be, when the court remains uninformed of the exact facts, to which the charge given was intended to be applied.

The charge of the Circuit court assumes, that a title to the land in question, vested in the defendant in error, by the operation of the treaty, if she came within the class of persons described as heads of families in the se-

cond article, and if the land sued for included her improvements. We think such a construction of the treaty cannot be supported, and that it is at variance with many of its provisions. That the individuals who were the heads of families, have a just claim on the government of the United States, to allot to them each a half section of land, according to the intent and spirit of the second article, cannot be questioned; but there is nothing in the terms used in it, which authorises the belief, that a *title* of any description whatever, vested by the *mere operation* of the treaty. So far as the present question is concerned, this is evident from the provisions of the second article, which directs " that a census of these persons (heads of families,) shall be taken under the directions of the President, and the selections shall be made so as to include the improvements of each person within his selection, if the same can be so made, and if not, then all the persons belonging to the same town, entitled to selections, and who cannot make the same, so as to include their improvements, shall take them in one body, in a proper form."

These expressions show conclusively, that the ascertainment of the individuals entitled, was to be confided to an agent of the government, appointed by the President, and that the respective Indians were to be located on the lands under his directions. It would be impossible, otherwise to ascertain what portions of the ceded lands could with propriety be sold, as the government would be continually in danger of invading on the rights of the Indians, if those particular lands were not ascertained and allotted. It is equally clear, that many Indi-

Rowland *vs.* Ladiga.

ans might have made improvements on the same half section of land, and in such a case, no rule is provided by the treaty, to determine the priority of right.   Again : the government does not stipulate that the Indians shall be invested with any other than a mere possessory right, coupled with a power of sale, until after the period of five years, and then only in the event " of their being desirous of remaining."

In the case of Jones and Parsons' heirs vs. Inge and Mardis' heirs, (5 Porter, 327,) and Fipps vs. McGehee et al. (id. 413,) the nature of those titles, derived under the treaty is very fully examined, and they are pronounced legal titles, capable of sustaining an ejectment, and of being transmitted to an approved purchaser.   But these decisions turn mainly on the ground, that the treaty stipulates that the Indians shall have a possession of the lands located to them, and provides that the government shall put them in possession.   In the latter case, the court holds this language: " To deny to the peaceful action of courts of law, a power which has been claimed to be exercised, on a summary application by an executive officer of the government, would present a solecism, which we are not disposed to admit."   Now, under the treaty, it is clear that the right of possession is consequent alone on the location, on the recognition of the right of the Indian by the government.   Until then, he has no title : he has, indeed, the same claim as all others on the government, that the utmost good faith shall be used toward him, but he can compel the government to locate him on the land to which he may be equitably entitled, or recover its possession from another, on the

mere strength of such a right. If the United States should so far forget the obligations of good faith, as to grant these lands to other persons, as the title remains with them, the Indians are remediless in courts of law. Such a supposition can never be admitted, however, and if wrong, as done in individual cases, it must arise from the want of correct information, or because the necessary means have not been taken by the Indian to establish his claims.

We do not intend to intimate any opinion, whether a patent wrongfully issued could be collaterally impeached. Such a question as this does not arise on this record, and from the generality of the terms used, we are compelled to presume, that a patent lawfully issued was shown in defence. This being the case, the title of the defendant in error, if dependent *alone on the treaty, and unascertained or unrecognised by the United States, by the act of location,* was not of sufficient dignity to prevail in a court of law. We thus limit the expression, not that we entertain the belief, that an application to a court of equity would be more appropriate, but because, in cases of this nature, necessarily affecting classes of persons, we do not deem it prudent to go beyond the precise question presented.

It is not necessary to examine the question supposed to be raised on the demurrer to the declaration, further than to determine, that the first count is liable to no valid objection, and consequently, would sustain the decision of the Circuit court, even if the second count was defective in substance.

For the error in the charge, as given, the judgment is reversed, and the case remanded.