BOARDMAN & BROWN v. THOMPSON.

I. Per WRIGHT, J.

1. **Champerty:** CHAMPERTOUS CONTRACTS VOID. Champertous contracts are in this State, as well as at common law, illegal, and void. The authorities to show that such is the rule in other States, cited. The doctrine announced in *Wright* v. *Meek*, 3 G. Greene, 472, dissented from by WRIGHT, J.

Boardman & Brown v. Thompson.

## II. Per Curiam.

2. —— contracts against public policy. Though there is no express statute against champerty in this State, the aid of our courts will not be given to enforce contracts which are in their nature champertous and against public policy.

3. —— rule applied. A contract entered into between two attorneys constituting a firm, and a client, stipulated, that for prosecuting a certain case against a railroad company wherein a large amount of damages was claimed, the attorneys were to receive for their services twenty-five per cent of the money recovered; that the client should not settle or compromise the case without their consent, and that, if he did thus settle, they should be entitled to and have their per cent on the full amount claimed in the petition, as their fees. It was further stipulated that the attorneys were to advance all costs and expenses in procuring testimony, and all other costs, for which, together with their traveling expenses and hotel bills, they were to be reimbursed out of the sum recovered, in addition to the per cent stipulated. *Held*, that the contract, together with two others of a like character, but differing somewhat in their stipulations, entered into at the same time, and in relation to other cases, were void, as being against public policy.

*Appeal from Marshall District Court.*

Thursday, July 23.

Plaintiffs are attorneys at law, practicing their profession as partners, at Marshalltown, in this State. In March, 1867, John S. and Robert N. Thompson, sons of defendant, aged 12 and 26 years, while crossing in a wagon belonging to defendant, the track of the Chicago & Northwestern Railway Co., were run over by the locomotive and train, the property destroyed and the children killed. On the 20th of the month (eight days after the accident), defendant employed plaintiffs to prosecute the railway company for these injuries, and entered into several contracts, which it is important to set out somewhat fully. That known in the pleadings as No. 1, recites the employment of plaintiffs, to recover for injuries to

*the property* and for the *services* of the minor child. Defendant was to pay said attorneys *out of any moneys collected of the company*, for trying the same and recovering judgment, twenty-five per cent on the amount so recovered. If the case was settled before the next term (in April), they were to receive ten per cent. If continued, or a change of venue taken, and then settled, they were to have seventeen per cent of the amount so received. If settled after a trial, second continuance or appeal, they were to have one-fourth, and a lien on the said money and indebtedness to the amount of the fees so due them under said contract. *Defendant was not to settle without plaintiffs' consent;* but if he did thus settle, the sum *claimed in the petition* was agreed upon as the amount of the recovery, and they were to have the per cent on said sum as their fees. The attorneys were to use all diligence in prosecuting the case, were to *advance all costs and expenses* in procuring testimony, and all other costs for which plaintiff (the present defendant) would be liable, and they would *not demand the same* until the cause should be settled or the damages recovered. The attorneys were also to have in addition to the percentage and costs advanced, all hotel and traveling expenses, out of the sum recovered or received.

This contract was in the name of Thompson, individually. The next recites that it is made with "Wm. Thompson, administrator of the estate of John S. Thompson, deceased," but it is signed in his individual name. It differs from the first only in a recitation of a want of funds belonging to the estate; and further, that the attorneys were not to call on their client for money or pay for their services or outlays during the pendency of the cause; *he was not to settle the same without the consent of plaintiffs and the county judge;* the said attorneys having the exclusive control of the cause and the "*irrevocable*

*power*, with consent of the said judge and plaintiff, to compromise and settle, whenever it should be deemed advisable, or to prosecute the same to a termination, *said power being coupled with an interest.*" Their compensation was graduated in this case the same as in the other, but it did not provide, in case of settlement without consent, that the per cent was to be governed by the amount claimed in the petition.

The third was made with defendant " as administrator of the estate of Robert N. Thompson, deceased," but signed in his individual capacity. In all other respects it is like the second, except that it binds the client to *aid in obtaining testimony*. The second and third were approved by the county judge, and they all contained a condition, that if the three cases should be settled by the 1st of the next April, at $8,000 or more, the attorneys were to have but seven per cent on the amount so recovered.

The three actions were commenced against the railway company the same day, claiming in the aggregate $60,000. On the petition of said company, they were transferred, as to it, to the U. S. Circuit Court in this State, and afterward, on the 14th of September, 1867, were settled by Thompson, without plaintiff's consent, he receiving $200 in the action brought in his own name, and $2,000 in each of the others, the company paying all costs.

This action was brought in December afterward against the Railway Company and Thompson, plaintiffs claiming $12,500, as due them under and by virtue of said contracts, as and for their services rendered, etc. This cause was also, as to the company, transferred to the federal court, but proceeded in the District Court of the State, against the other defendant.

There was a trial to the court at the last April Term, judgment for plaintiffs in the sum of $1087.83 with costs.

Both parties excepted to certain rulings of the court, and both appeal.

*Withrow & Wright* for the plaintiffs.

1. Neither of the contracts are champertous or in the nature of maintenance.

" The doctrine of champerty and maintenance is not applicable to this State." * * *

" To transfer the right of action, or to maintain the suit of another, without having any direct or contingent interest in it, will not necessarily produce mischief or oppression in this country. It may, on the other hand, in particular cases, have a tendency to secure rights and promote the ends of justice." *Wright* v. *Meek*, 3 Greene, 472.

No one is liable to this charge who gives honest advice to go to law, or advances money from good motives to support a suit. 2 Parsons on Cont. (2d ed.) 263 ; *Perine* v. *Dunn*, 3 Johns. Ch. 508 ; *Thalkirmer* v. *Brickerhoff*, 3 Cow. 647.

A contract by a client to pay an attorney a sum equal to one-tenth of the amount recovered is not champerty. *Evans* v. *Bell*, 6 Dana, 479 ; *Willheite* v. *Roberts*, 4 id. 172.

A legatee too poor to sue, sold the legacy to another for the express purpose of having it enforced by law,— held not champerty. *Tyson* v. *Jackson*, 30 Beav. 384.

It is not the consideration that constitutes champerty, but the officious intermeddling. *Lathrop* v. *Amherst Bank*, 9 Met. 492.

The Revision of Iowa (§ 4300) has defined what act or acts on the part of an attorney would be illegal, and there must be an intent to injure.

" The law in this respect (as to champerty), has been greatly modified by the late cases and by the general

change of opinions and customs. * * * If, therefore, there be any privity of interest growing out of peculiar relations of trust or confidence between the parties independent of the assistance rendered to carry on the suit, as if they stand in relation of landlord and tenant, father .and son, master and servant, husband and wife,—mere assistance by money or services, would not amount to maintenance." 1 Story on Cont. (4th ed.) 579.

Says Lord Abinger : "I do not like to give an opinion upon an abstract case, and am, therefore, not desirous to consider it, but if a man were to see a poor person in the street, oppressed and abused, and without the means of obtaining redress, and furnished him with money, or employed an attorney to obtain redress for his wrongs, it would require a very strong argument to convince me that that man could be said to be stirring up litigation and strife, and to be guilty of the crime of maintenance." *Findon* v. *Parker*, 11 Mees. & Wels. 675.

2. The contracts are not contrary to public law, nor public policy.

"Public policy is in its nature so uncertain and fluctuating, varying with the habits and fashions of the day, with the growth of commerce and the usages of trade, that it is difficult to determine its limits with any degree of exactness. It has never been defined by the courts, but has been left loose and free of definition in the same manner as fraud." 1 Story on Cont. § 546.

"But it is enough that the contract is good upon its face, and the plea does not clearly prove it was injurious to the public. In *Richardson* v. *Mellish* (2 Bing. 229) one objection was, that the contract was contrary to public policy, and Best, Ch. J., said he was not much disposed to yield to such arguments, and he thought an unquestionable case should be made out before the courts would set aside a contract on that ground. And Bur-

ROUGH, J., protested against arguing too strongly upon public policy. He said: "It is a very unruly horse, and when once you get astride it you never know where it will carry you, — it may lead you from the sound law." "There is force in this remark." *Chappel* v. *Brockway*, 21 Wend. 164.

Where it was agreed between the plaintiff and his attorney that upon final success, he should receive one-half the amount recovered and costs, an irrevocable power of attorney was given to receive the amount, and defendant had notice. The court say: Under these circumstances, defendant negotiated with plaintiff for a compromise at his peril. \* \* The amount an attorney can receive is no longer limited. The amount between him and his employer may be fixed beforehand, and when this is honestly and legally done, why should the defendant be allowed to intervene, and by a settlement with the party aid him in depriving the attorney of what is jusly due. The attorney is to be regarded as an equitable assignee of the judgment to the extent of his claim for services in the action. \* · \* \* The compensation to attorneys is now left to the agreement of parties. What was before not only illegal but disreputable is now lawful if not respectable. *Rooney* v. *Second Av. R. R. Co.*, 18 N. Y. 371; affirmed in *Ely* v. *Cooke*, 28 id. 372.

As to attorney as assignee, see *Wilkins* v. *Batterman*, 4 Barb. 47; *Stockton* v. *Hart*, 12 Ab. Pr. 325, note; 30 How. Pr. 39; *Ely* v. *Cooke*, 2 Hill, 406.

*Henderson & Binford* for the defendant.

The contracts are void for champerty and maintenance and ought not to have been admitted in evidence. This is the principal question involved in the case at bar.

1. Champertous contracts were void at common law, independent of the English statutes. *Scoby* v. *Ross*, 13

Ind. 117; *Lathrop* v. *Amherst Bank*, 9 Met. 489, and authorities therein cited; 2 Parsons on Contracts, 263–4.

2. Champerty is not merely *malum prohibitum*, but is *malum in se* by the common law. *Thurston* v. *Percival*, 1 Pick. 415; *Backus* v. *Byron*, 4 Mich. 537; *Laferty* v. *Jelly*, 22 Ind. 471; *Small* v. *Mott*, 22 Wend. 406. The case cited above in 4 Michigan is an elaborate and able review of the authorities on the doctrine of champerty and maintenance, both English and American.

3. The principles of the common law are recognized and in force in Iowa. Organic Act of Wisconsin, Rev. 952, § 12; article 2, Ordinance of 1787, Rev. 930; *Estes* v. *Carter*, 10 Iowa, 401; *O'Farrell* v. *Simplot*, 4 id. 381; *Conger* v. *Dean*, 3 id. 463; *Fink* v. *Fink*, 8 id. 313; authorities cited in Dillon's Digest, 263.

4. Contracts contravening the common law are void. *Wheeler* v. *Russell*, 17 Mass. 257; *Lathrop* v. *Amherst Bank*, 9 Met. 489.

5. Acts not indictable under the statutes, but by the common law, are nevertheless void. *Key* v. *Vattier*, 1 Ohio (Hammond), 132; *Weakly* v. *Hall*, 13 Ohio; *Small* v. *Mott*, 22 Wend. 403. The case cited in 22 Wendell is reviewed and criticised in 14 N. Y. 289, and a contrary doctrine is there held; but it will be observed that in that case the Court of Appeals base their decision upon the legislative action of the State of New York: first, by enacting, substantially, the common law on the subject of champerty and maintenance; second, by repealing that law, with the intention to abolish champerty and maintenance. Hence the recent New York doctrine is *sui generis*.

6. The contracts are illegal and void, and against public policy, in that they erect barriers against amicable adjustment by the parties to the contemplated suits. *Ellwood & Lowrie* v. *Wilson*, 21 Iowa, 523.

A strong case is reported in 9 Common Bench (N. S.) 566, entitled *Easle* v. *Hopwood*, where a contract for moneys advanced by an attorney to conduct a suit, and receive compensation commensurate with the services rendered, moneys advanced and the beneficial results to the client, was held to be illegal and void. This was a more meretorious case, it would seem, than the one at bar, for that contemplated a real *quantum meruit*, while the contracts in this case are for exorbitant and unconscionable fees.

7. The two contracts on behalf of the estates are not enforceable against Thompson in his individual capacity; they are made on behalf of the estates, and were intended to be enforced against the estates, as is shown by the submission of them to the county judge for his approval. But his approval could not make them legal.

8. The suits against the estates could not be brought into the District Court without the consent of the county judge. Rev. 1860, § 2395.

WRIGHT, J. — The important question in the case, and that to which most of the argument has been directed,

1. CHAMPERTY: champertous contracts void. arises upon defendant's appeal. It goes to the whole merits of the controversy and will first receive attention; for if sustained, it disposes of the case, and renders an examination of all others unnecessary. The point thus raised is, whether the contracts upon which plaintiffs declare are void for champerty or maintenance, or as being against public policy, or otherwise. The defendant affirms, the plaintiff denies.

Before entering upon its discussion, it is proper to say that the testimony is all before us, and if upon this, plaintiffs were not entitled to recover — there being proper issues in the answer — defendant is not concluded even by a failure to except to the ruling of the court on his

demurrer to the petition. But he did except to such rulings, as also to the introduction of the contracts in evidence, to the judgment and all the rulings. How he could more successfully or properly obtain a standing in this court to raise the question made, we cannot easily imagine. In every stage of the case, and in every method known to the practice, he saved the question, and now presents it fairly for our determination.

A very interesting and well considered case, upon a question quite analogous is that of *Kennedy* v. *Brown and Wife*, in the English C. B., found in Law Reg., April, 1863 (7 L. T. Rep. 626; 9 Jur. 119). It is there decided (ERLE, Ch. J., delivering the opinion) that a promise by a client to pay money to counsel for his services, whether made before, or during, or after litigation, has no binding effect; and that the relation of counsel and client renders the parties mutually incapable of making any legal contract concerning advocacy in litigation. And the opinion proceeds at some length, and by a thorough examination of the authorities, to show that in England a counselor cannot bring an action for his fees, that this is *honorarium* and not a debt, or, as Blackstone has it (328), "fees are given not as *locatio* or *conductio* but as *quiddam honorarium*—not as salary or hire, but as mere gratuity."

In this country—in all the States except New Jersey (see the able and admirable note to the above case, Law Reg. 1863, p. 372)—the doctrine is settled otherwise, and here the attorney, or counselor, or advocate (for the distinction between them is not kept up in many of the States) may maintain an action for his fees in litigation. And though accepting and bowing to the decisions as made, we cannot but admire and approve the high and dignified ground taken by the English court in following the rule of the common law. For reference, and also for

Boardman & Brown v. Thompson.

use in the further consideration of the case before us, we append, in the form of a note, a part of the opinion : *

* The incapacity of the advocate in litigation to make a contract of hiring, affects the integrity and dignity of advocates, and so is in close relation with the highest of human interests, namely, the administration of justice. * * He is trusted with interests, and privileges and powers almost to an unlimited degree. His client must trust to him at times for fortune, and character and life. The law trusts him with a privilege in respect of liberty of speech, which is in practice bounded only by his own sense of duty ; and he may have to speak upon subjects concerning the deepest interests of social life, and the innermost feelings of the human soul. * * It is of the greatest importance that this sense of duty should be in active energy proportioned to the magnitude of these interests. If the law is, that the advocate is incapable of contracting for hire, his words and acts ought to be guided by a sense of duty, that is to say, duty to his client, binding him to exert every faculty, and privilege and power, in order that he may maintain that client's right, together with duty to the court and himself, binding him to guard against abuse of the powers and privileges intrusted to him by a constant recourse to his own sense of right. If an advocate with these qualities stands by the client in time of his utmost need, regardless alike of popular clamor and powerful interest, speaking with the boldness which a sense of duty can alone recommend, we say the service of such an advocate is beyond all price to the client ; and such men are the guarantees to communities for the maintenance of their dearest rights, and the words of such men carry a wholesome spirit to all who are influenced by them. Such is the system of advocacy intended by the law requiring the remuneration to be by gratuity ; but, if the law allowed the advocate to make a contract of hiring and service, it may be, that his mind would be lowered, and that his performance would be guided by the words of his contract, rather than by principles of duty ; that words sold and delivered according to contract, for the purpose of earning hire, would fail of creating sympathy and persuasion in proportion as they were suggestive of effrontery and selfishness, and that the standard of duty throughout the whole class of advocates might be degraded. It may also well be, that, if contracts for hire could be made by advocates, an interest in litigation might be created, contrary to the policy of the law against maintenance, and the rights of attorneys might be materially sacrificed, and their duties be imperfectly performed by unscrupulous advocates ; and these evils, and others that may be suggested, would be unredeemed by a single benefit that we can perceive."

And, while we concede the right of the attorney in this State to maintain an action for his fees, we nevertheless adopt, to the fullest extent, all that is here said as to the duty and responsibility of the profession.

By no word of ours will we willingly recognize any rule or sanction any practice which shall tend to bring reproach upon its members, or degrade it in public esteem. To prevent this, we think a great step is gained by looking narrowly into, if not holding entirely invalid, these contracts between attorney and client, where the anxious suitor, "elevated by hope and depressed by fear," is induced to promise and undertake to pay extravagant, and often unconscientious, contingent fees. And so a like service is rendered by courts, where they set their faces against all those contracts, whereby the attorney undertakes, in a case, to which he is otherwise a stranger, to advance fees to officers and witnesses, to manage the litigation at his own present expense, and which prohibits any settlement against his will or consent. But, dismissing these general thoughts, we come to the more particular consideration of the question before us.

It was held, in *Wright* v. *Meek* (3 G. Greene, 472), that we had no statute in this State against champerty and maintenance, nor was there any necessity seen for adopting the English law on this subject. The weight to be given to this opinion is greatly lessened by the reflection that the point was really not in the case, for it was expressly held, and most reasonably, that though the law obtained here, plaintiff was not obnoxious to its penalties. That was a case where two *sons* were assisting the *father* in the prosecution of his action; and this is not claimed to be "unlawful maintenance." But I ask why are not champertous contracts void in this State? True, they are not so declared by statute. But they were so at common law. *Peckel* v. *Watson*, 8 M. & W. 691. And

this has been recognized as a part of our system, its principles being the rules of our decisions, except as modified by statute. Of course, this last remark is subject to the qualifications, that these principles must be applicable to the nature of our institutions and to the genius of our form of government — as also to our habits, wants and necessities. And are there any reasons why the law of champerty is not applicable here? For reasons hereinafter stated, the ruling in this cause is not placed upon this ground, and yet I may be allowed (without concluding the other members of the court) to express the opinion that champertous contracts are illegal in this State.

They have no statute against champerty or maintenance in Indiana, and yet, it has been held repeatedly, that the common law on these subjects prevailed there, and that such contracts were void. This will be seen by reference to *Lafferty* v. *Jelly*, 22 Ind. 471; *Coquillard* v. *Bearss*, 21 id. 479; *Scobey* v. *Ross*, 13 id. 117.

The case before us is much stronger than that last cited; and yet there all the judges held the contract champertous. So in Alabama. See *Halloway* v. *Chandler*, 9 Port. 488, which was decided upon the common law. In Massachusetts, see *Lathrop* v. *Amherst Bank*, 9 Met. 489; and *Thurston* v. *Percival*, 1 Pick. 415; and see *Key* v. *Vattier*, 1 Hammond (Ohio), 132; like the case before us, in the fact that no compromise could be made except the attorney should join in it. Also *Weakly* v. *Hall*, 13 Ohio, 167. In New York — *Merritt* v. *Lambert*, 10 Paige, 352; S. C., 2 Denio, 607 — the rule was the same until changed by their Code of Procedure. *Satterlee* v. *Frazier*, 2 Sandf. 141. And see further, in New York, *Arden* v. *Patterson*, 5 Johns. Ch. 44; *Matter of Bleakly*, 5 Paige, 311; *Berrien* v. *McLane*, Hoffman (N. Y.) 421; also *Benedict* v. *Stuart*, 23 Barb. 420, as to modifications of the Code. These cases from New York were all upon con-

tracts between client and attorney, and hence their peculiar applicability. And see further *Wilhite* v. *Roberts*, 4 Dana, 172. (Contract in that case not held illegal, but see remarks of the court on the general subject.) *Boyd* v. *Oden*, 9 Ala. 755; *Thompson* v. *Warren*, 8 B. Mon. 488; *Slade* v. *Rhodes*, 2 Dev. & Bat. 24; *Brown* v. *Beauchamp*, 5 Monroe, 413; *Weedon* v. *Wallace*, Meigs (Tenn.) 286; *Backus* v. *Byron*, 4 Mich. 537. As to the old law and rules under it, by the common law as well as English statutes, see 1 Jac. L. Dict. 420; 2 Inst. 208 and 564; 4 Black. Comm. 135; *Stanley* v. *Jones*, 7 Bing. 369; 4 Kent, 449; Bouvier L. Dic.

It is not needful that I should go into the discussion of the general subject, as my only design is to justify, somewhat, my dissent from the doctrine announced in *Wright* v. *Meek, supra.* I grant that some of the reasons which obtained in favor of the doctrine originally, cannot be urged in this country. Justice may not be endangered in the same manner here as in England by champertous practices; the privileges of the law may not possibly thus be perverted into engines of oppression, and still the foundation may be as effectually corrupted thereby as formerly, and the duty of the judicial department no less imperative to put the stamp of disapprobation upon any and all schemes calculated and having a tendency to hazard its dignity.

Formerly, it may be conceded that more formidable combinations might be formed, for the purpose of controlling, if not intimidating, judicial tribunals, and yet it must be remembered that there may still be officious intermeddling, that there may still be those, who without right will seek to uphold by their services and money, another's litigation. 9 Met. 492.

I will not, however, say more, but pass at once to the

final view of the question involved. Are these contracts void as against public policy? We answer, yes.

2. —— contracts against public policy.

We are aware that it has been said that this (public policy) is in its nature uncertain and fluctuating; that it is difficult to determine its limits with any degree of exactness; that it is an unruly horse, which, once astride, you know not where it will carry; that it may lead from sound law. Story Cont. § 546; *Richardson* v. *Mellish*, 2 Bing. 229. And yet courts in all countries have more or less to do with it in all their deliberations. From the earliest times, contracts have been declared void because against public policy. It varies, we know, with the growth of society; it is being constantly modified and changed by the habits of our people, and the usages of trade; and it is right that it should be so. And with these changes the courts must keep pace, not riding recklessly, but cautiously, and, if possible safely; not being led "from sound law," but the more certainly to its just, true and enlightened exposition. The best and most expedient rules may be pushed to such extremes, and applied to such cases, as to produce the greatest hardships. So, too, those lights usually the most reliable, may and will at times betray and mislead. It is for those administering these rules, and guided by their lights, to so apply and use them as that the law may be upheld in its purity, the rights of all protected, and public confidence in its efficacy to prevent wrong and fraud, maintained unimpaired. It is theirs to act with firmness, applying the knife if need be, with vigor; not fickle minded, not accepting every thing labeled "public policy" as such, but remaining ever true to duty, allow no party to be heard in its courts, who relies upon an illegal contract, who seeks to recover upon agreements which the wisdom of ages condemns, those calculated to endanger the peace and harmony of society, and

which must inevitably tend to keep alive the most bitter and often disreputable litigation.

It may be, according to the theory of some, that a thing may be lawful and not respectable, and that it may be disreputable, but not illegal; and yet, as applied to the attorney and his work, we discard it entirely. And of the attorney, so of the client. There should be no sympathy for that moral obliquity which leads the client to sacrifice on the altar of meanness, and to refuse a just compensation to, the true and faithful attorney, who, by his zeal and devotion to his cause, has saved his character, property and, may be, life. But these reciprocal duties and obligations can be enforced without violating any law, human or divine, and, without sanctioning contracts calculated to oppress the one, bring the other into disrepute, or endangering the dearest rights of the citizen and the community.

It was said in *Marshall* v. *Baltimore & Ohio Railroad Co.* (16 How. 457), that, "public policy and sound morality do imperatively require that courts shall put the stamp of their disapprobation on every act, and pronounce void every contract, the ultimate or probable tendency of which would be to sully the purity or mislead the judgment of those to whom the high trust of legislation is confided."

The cases of *Fuller* v. *Dame*, 18 Pick. 470; *Hatzfield* v. *Gulden*, 7 Watts. 152; *Clippinger* v. *Hessbaugh*, 5 M. & S. 315; *Wood* v. *McCan*, 6 Dana, 366; *Hunt* v. *Test*, 8 Ala. 719; *Commonwealth* v. *Callaghan*, 2 Virg. Cases 260 are cited, the court adding, that "the sum of all these cases is, that all contracts for a contingent compensation for obtaining legislation, or to use personal or any secret or sinister influence on legislation, are void by the policy of the law." If true of legislation, why not of courts, especially as to the contracts of those who

are among its officers or agencies in the administration of justice, and who, in this State, by statute as at common law, are bound not to encourage either the commencement or continuance of an action or proceeding from any motive of passion or interest; nor to reject for any consideration personal to themselves, the cause of the defenseless or the oppressed. Rev. § 2704, clauses 6 and 7.

Then, in *Gil* v. *Williams* (12 Lou. Ann. 219), it is said: "The plaintiff in this case cannot recover, not because he has resorted to bad means in order to procure the passage of laws, in which he had a direct pecuniary interest, for of this there is no proof or imputation, but because he has made a contingent contract, which, if enforced in this case, might open the door to a practice of corruption and to the use of sinister influences." And to the same effect, see *Marshall* v. *R. R. Co.*, *supra*; also *McGill's Admr.* v. *Barnett*, 7 J. J. Mar. 640; *Gray* v. *Hook*, 4 Comst. 449; *Bryan* v. *Reynolds*, 5 Wis. 200; *Mills* v. *Mills*, 36 Barb. 474.

In 4 Comstock, *supra*, it was held, that the contract was void, by the principles of the common law, as against public policy. And, quoting from Comyn, it is added, "all contracts or agreements which have for their object any thing which is repugnant to justice, or against the general policy of the common law, or contrary to the provisions of any statute, are void; and, whenever a contract or agreement is entered into with a view to contravene any of these general principles, there is no form of words, however artfully introduced or omitted, which can prevent courts of law and equity from investigating the truth of the transaction; for, *ex turpi contractu actio non oritur* is a rule both in law and equity." 1 Com. Con. 30. And so where the contract grows immediately out of and is connected with an illegal or immoral act, a court of justice will not lend its aid to enforce it. Story's Eq. 296.; *Arm-*

*strong* v. *Toler*, 11 Wheat. 258; 6 Cord. 298; *Bartle* v. *Coleman*, 4 Pet. 184; *Craig* v. *The State of Missouri*, id. 410; *Waite* v. *Harper*, 2 Johns. 386; *Tuxbury* v. *Miller*, 19 id. 311; *Key* v. *Vattier*, 1 Ham. 132. In this last case, it is said, though there is no statute punishing champerty, and though the common law in relation to the punishment of crimes is not in force, yet the aid of courts will not be given to sanction or enforce champertous or other contracts contrary to public justice and the peace and happiness of the community. And in *Fuller* v. *Dame, supra,* Shaw, Ch. J., says: "The law goes further than merely to annul contracts, when the obvious and avowed purpose is to do or cause the doing of unlawful acts. It avoids contracts and promises made with a view to place one under wrong influences — those which offer him a temptation to do that which may injuriously affect the rights and interests of third persons." *Chesterfield* v. *Janssen*, 2 Ves. Sen. 125; Story's Eq. 262. And see, fully recognizing these general principles, in this court: *Guenther* v. *Dewien*, 11 Iowa, 133; *Reynolds* v. *Nichols*, 12 id. 398; *Pike* v. *King*, 16 id. 49, and the many cases there cited; also, *Ellwood* v. *Wilson*, 21 id. 523; *Davis* v. *Bronson*, 6 id. 410; *Wheeler* v. *Russell*, 17 Mass. 258; *Holman* v. *Johnson*, Cowper, 343; *Russell* v. *De Grand*, 15 Mass. 39; *Langton* v. *Haynes*, 1 M. and Selw. 593.

But without stating further these well recognized principles, or undertaking to further fortify them by the authorities (as of course might be done without limit), we come to apply them to the case at bar. It will be observed, that, by two of the contracts in suit, defendant undertakes, as may be conceded for the purposes of the argument, in his individual capacity, that plaintiffs shall have in a certain contingency one-fourth of the amount recovered in favor of the estates which he represents. And this

sum they are to have out of the money recovered, whether by judgment or settlement. In one of them the client is required to give his aid in obtaining testimony. In the others nothing is exacted in the prosecution of the cases, at his hands. In the first, if the case was settled without their consent, plaintiffs' fees were to be based upon the amount claimed in the petition. (And here we may remark, that the petition when filed claimed $10,000, and if plaintiffs can enforce the contract, we do not see why they are not entitled to $2,500, instead of that proportion of the $200 actually received; nor do we see further why, upon the same theory, plaintiffs had not a right to introduce the testimony offered by them, to show what probably would have been recovered if the cases had gone to trial. If the contracts are enforceable, this would seem to follow as a legitimate result.)

But in neither of them could there be a settlement without the consent of plaintiffs, and in all they were to advance money to pay officers, court expenses, and witnesses, not calling upon the clients for any thing until the cases were determined. The per cent agreed upon, their expenses in traveling, etc., the fees advanced,— all were to come out of the amount recovered or received. And if such contracts as these can be sustained, then we dismiss all thought of suitors certainly drawing their remedies "from pure fountains." *Lowrie* v. *Bordien*, Doug. 468. If so, then it is idle to say that "the law encourages the amicable adjustment of disputes." 21 Iowa, *supra.* Sustain it, and the attorney, acting "while the fever of his client is up," will make contracts by which he will become directly interested in the prosecution of every case; and, forgetting "the dignity of the robe" (GIBSON, Ch. J., in *Foster* v. *Jacks*, 4 Watts, 334), and his sworn obligations to maintain or counsel no other proceedings than those which appear to him legal and just, and the other

high duties devolving upon him by statute and common law, will inevitably, even if unconsciously, become the inciter of (to the client) the most dreaded litigation; and his voice and services, in the administration of justice, will be used for a purpose far other and different from what was ever contemplated at any time in the history of the law. In no other State do we find such contracts upheld, and we do not propose to be the first to set the example. That litigation may be prevented; that strife may not be stirred up; that those officiating in the tribunals of justice may not have such powerful temptation to use their talents and influence in behalf of causes ever so unjust; that we do not drift so entirely and completely away from the original office and duty of the counsel and advocate; that we may not forget the confidential relation existing between client and attorney; that we may be in accord with the tendency of that legislation and those decisions, which, upon grounds of public policy, declare void, contracts which tend to sully the purity of those in legislative or judicial positions, — we deem it to be our clear duty to pronounce such contracts invalid.

And, believing that these contracts are invalid — that they come within the rules and are liable to the objections stated — we have not hesitated to so conclude, though we most frankly admit that there is nothing to show the least taint of fraud or the use of undue influence on the part of plaintiffs. They have secured contracts, it may be, not unusual in their terms. It may be, and possibly is true — in view of the situation of defendant and his need of aid at the time these contracts were made — that plaintiffs are " more sinned against, than sinning." For aught we know, defendant is proving false to the truest guardians of his interest — impelled thereto by anger, spite, meanness; or it may be that his is the " paw which handles hot.chestnuts for others." Of these things

·we do not inquire. Ours is the duty to declare the law, not for one case alone, but for all those to which the subject under discussion may be applicable. Looking to this alone, while we by no means hold that it is not competent for an attorney to contract for what may be shown to be a fair contingent fee, we, nevertheless, feel constrained to conclude that these contracts provide for something more than this, that they cannot be upheld, and that the court below erred in holding that plaintiffs could recover upon them.

The other questions in the case need not be examined. The judgment below on defendant's appeal is reversed. As to plaintiffs it is affirmed, they paying the costs of both appeals.