## JOHNSON *v.* VAN WYCK.

Champerty and Maintenance; Public Policy.

1. Where the recitals of a deed under which a plaintiff in ejectment claims, and of certain contracts and trusts referred to in the deed, show the existence of a scheme between claimants of certain real estate and an individual, wherein he undertakes to recover the property for one-half of the recovery, and covenants to institute and maintain the necessary suits at his own expense, and also show the existence of a trust or syndicate organized to raise money by the issue of stock certificates to maintain the litigation, the sole asset of which trust or syndicate consists of his prospective share of the result of the proposed litigation, the title being placed in the plaintiff as common trustee for purposes of convenience and protection ; such deed is champertous within the meaning of the statutes Edward I and III and 32 Hen. VIII, relating to champerty and maintenance.

2. Those statutes are declaratory only of the common law, under which champerty and maintenance are things *malum in se ;* and, whether the statutes are now obsolete in this District or not, such a deed is void as champertous, and as opposed to public policy.

3. Such a deed will not be held to vest the legal title of the claim-
ants in the trustee plaintiff, but to be tainted with the illegality
of the whole scheme and therefore void.

No. 336.  Submitted October 11, 1894.  Decided November 5, 1894.

HEARING on a bill of exceptions by the plaintiff in an
action of ejectment.  *Judgment affirmed.*

The COURT in its opinion stated the case as follows:

This is an action of ejectment brought by J. J. Johnson,
trustee, to recover a square of land in the city of Washing-
ton.  This square is a part of the original tract of 494 acres
of land known as "Jamaica," before the laying out of the
city of Washington, and is, with the exception of about 50
acres, included in the original plan and survey thereof.
Samuel Blodget purchased the tract subject to a contract
with the Commissioners made by his grantors, and in the
allotment thereunder took a title in fee simple to about one-
half of the squares and lots as designated on the original
map of the city.

The plaintiff, claiming under grant from the heirs of said
Samuel Blodget and certain grantees and agents of theirs,
proved heirship properly, and then offered in evidence the
conveyance under which he claimed, together with certain
other instruments referred to therein and made parts of it.
The deed was excluded upon the objection of defendant
"that it was void as champertous and against public policy."
As this objection is founded on the recitals of the papers
excluded, they are fully described and stated in the order
of their execution, as follows: 1. June 27, 1873, the heirs of
Samuel Blodget, deceased, entered into an agreement with
one Lorin Blodget, authorizing and empowering him to
institute suits at law and in equity to recover all real estate
of said Samuel Blodget in the city of Washington, includ-
ing claims against buildings and property of the United
States and claims against the Commissioners charged with
laying out the city, and certain personal claims, and so forth,
excepting only "French Spoliation Claims."  The said Lorin

Blodget was fully empowered to bind the grantors "in contracts for conveyances, acquittals and releases of title to all or any part of said estates and claims . . . and to settle and adjust them in his discretion, and to execute final and absolute deeds and other conveyances, and to hold and lease such properties when in his judgment their interests rendered it desirable to do so, and to sign in final release on proper settlement for any and all of said claims." The said Lorin Blodget *promised to prosecute the claims with diligence "and to pay all expenses and costs of such proof and prosecution."* It was also stipulated that in consideration of said Lorin Blodget's contract to "prosecute, recover and collect the said estates and claims *at his own proper costs and expenses, he shall be entitled to and shall have the one-half of all the proceeds thereof."* The said Lorin Blodget further agreed to file an account annually as trustee in the proper court in the city of Philadelphia, if requested by any of the parties of the first part, in which he shall set forth all his transactions and settlements. It was admitted on the trial that the said Lorin Blodget was neither an heir of said Samuel Blodget, nor a kinsman of an heir. 2. May 29, 1884, an indenture was made between the said heirs and the said Lorin Blodget, as parties of the first part, and one Robert Morrison as party of the second part, which recites the aforesaid agreement of June 27, 1873, and makes it a part thereof, and declares a desire to make said trust and agreement "*effectual to the fullest extent."* Then, reciting a consideration of the premises, and the further consideration of $10, it conveys to the party of the second part (Morrison) "all the right, title, interest and estate in and to all the estate, real and personal, of which Samuel Blodget, deceased, died seized and possessed; consisting of certain claims and rights in law and equity against certain of the buildings and property of the United States in the District of Columbia and of claims upon the Commissioners of Washington" and so forth . . .; "and also consisting of and being certain tracts, squares, lots and

parcels of ground in said District of Columbia being all that piece of land known as, and commonly designated as, 'Jamaica.'" . . . The land is then described by its ancient boundaries, and again also by numbers of the many squares into which it was divided, as shown on the city map. This conveyance is made "in trust for the sole use, benefit and behoof of the said parties of the first part and the said party of the second part as declared in the trust to the said Lorin Blodget of record as aforesaid—and upon this further trust, from time to time, and at all times to dispose of, convey, acquit and release the same or any part thereof, to such person or persons, to such use and purposes and in such quantity and quality of estate or estates as in the judgment of the said party of the third part shall seem meet and proper, in the best interests of all concerned, and upon this further trust, to prosecute, sue for, recover and collect said estates and claims and any and every part thereof, and to convert the same into money, keeping an exact account of all his transactions and of all moneys recovered by him, which account shall be open and accessible to the inspection of any and all of the parties hereto, their agents or attorneys; and upon this further trust, to account for and pay over unto the said Lorin Blodget, trustee, party of the second part, all moneys that shall or may come into his hands in the execution of his trust as provided for and intended by the hereinbefore-recited deed, agreement and trust to said party of the second part, for distribution by the said party of the second part according to the provisions of said deed, agreement and trust." 3. January 22, 1887, Lorin Blodget executed a power of attorney to the Union Trust Company of Philadelphia, reciting the two foregoing instruments and empowering it to collect and enforce collections of the property under his right as administrator of Samuel Blodget, Jr., deceased, *as trustee,* and as "*a party in interest therein.*" 4. On February 8, 1887, an agreement was made by

and between said Robert Morrison, trustee, and one William F. Boogher as follows:

"Whereas, Wm. F. Boogher, of Washington City, D. C., has furnished to D. R. Patterson, Esq., of Philadelphia, Penna., share certificates Nos. 51, 52, 53, 54 and 55, each for $1,000, and share certificate No. 56, for $5,000 (the total par thereof being $10,000) of the estate of Samuel Blodget, Jr., deceased, for sale as instructed and in such quantities as he may be able to dispose of the same the proceeds derived therefrom to be deposited with the Union Trust Company of Philadelphia, Penna., *and to be applied under the direction of said company to- the prosecution of certain suits now pending and to be instituted for and about the property and concerns of the said Samuel Blodget, Jr., deceased,* which are solely and only located in the District of Columbia, to wit, only the real-estate concerns of said deceased, and *in and about which properties the said Boogher has certain rights and interests ; and is to provide means wherewith. to conduct and prosecute the suits now instituted and to be instituted, and to effect which he has as aforesaid placed the said shares in the hands of said Patterson for negotiation and sale.*

"And whereas Robert Morrison of said city of Washington is, under and by virtue of a certain deed, dated May 29, 1884, made and executed by the heirs of said Blodget and also Lorin Blodget, of Philadelphia, Penna., to him the said Morrison and his successors, duly constituted the trustee for said heirs and said Lorin Blodget, and as such trustee holds for said parties the title to said properties located in the District of Columbia, and as such trustee has instituted certain suits and proceedings for and about the said properties in the supreme court for the District of Columbia, looking toward the recovery thereof, and enforcing the rights of said heirs thereto, which suits &c., are now pending, and said trustee is about to bring other actions or proceedings in the same court for the said heirs and for the same purposes and .promises and agrees to press the rights of said heirs and the

said causes to as speedy a determination and settlement as possible and in good faith.

"And whereas the said Lorin Blodget has on the 22d day of January, 1887, in his own right, and also as trustee and attorney-in-fact for the heirs of said Samuel Blodget, deceased, and also as administrator of said deceased, appointed the said Union Trust Company his true and lawful attorney to ask, demand, sue for, levy, recover and receive all moneys, debts, rents, goods, wares, dues, accounts and other demands of every sort, which are or shall be due, owing, payable and belonging to or detained from him the said Lorin Blodget in or by any way, manner or means on account of his interest under his contract, agreement and indenture made with the heirs-at-law of Samuel Blodget, deceased, dated June 27, 1873, and under the said deed to said Morrison as trustee, dated May 29, 1884; and also as administrator as aforesaid, and also by said power of attorney dated January 22, 1887, gives to said Union Trust Company full power and authority to collect and enforce the collection of whatever property, effects and sums of money may be or become due, owing, payable or deliverable to said Lorin Blodget as such administrator, also as trustee for the parties in interest, and also as a party in interest therein, also the said Union Trust Company under said power of attorney is as such attorney to account to and pay over to the *several parties in interest in said estate whether as heirs-at-law or otherwise, said property, effects and moneys in such proportions and amounts as shall be designated and awarded by the tribunals or courts having jurisdiction of the accounts of said Lorin Blodget as administrator and trustee aforesaid,* also giving to said Union Trust Company full and entire power in all the said matters, also to sign all receipts, dues, papers and acquittances necessary for said administrator to do in, to or about any or all such matters or pertaining thereto in any way, with power to appoint agents or attorneys to carry out the same, and to revoke any such appointments and ratifying and holding

for firm and effectual all that the said Union Trust Company may do under and by virtue of said power of attorney, and by special promise and contract making the same irrevocable and taking considerations and services thereunder.

"And whereas *it is the desire of each and all the parties hereto to have the purposes and conditions of said arrangement of said Wm. F. Boogher with said Union Trust Company and said D. R. Patterson, as well also as the purposes and conditions of said power of attorney made by said Lorin Blodget as administrator, trustee, &c., &c., fully, thoroughly and completely carried out in all parts and intendments of both and all,* and also it is the *desire and intent to secure the services of the said Union Trust Company, in and about all singular and several matters touching or concerning the said matters involved in or concerning said estate;* and matters referred to herein.

"Now therefore the said Wm. F. Boogher in consideration of this agreement and its advantages by him recognized, for himself his heirs and assigns, agrees to and with all the parties hereto, and with the said Union Trust Company, that the funds and proceeds derived from the sale of the said share certificates shall be deposited with the said Union Trust Company, and from time to time, as occasion may in the judgment of the Union Trust Company require be applied to the *payment of the costs and expenses necessary to the conducting of the several suits and proceedings touching and concerning said matters* involved in the matters concerns and estate of which said Morrison is trustee as aforesaid. *Except that it is understood that out of said proceeds said Boogher is to have for his own use and expense one hundred and twenty-five dollars per month.* But the expense of pressing said suits is to be first considered and no allowance to said Boogher is to interfere with the enforcing the rights and claims of said heirs by every legal method and process. And the said Boogher recognizes, consents to and affirms the said power

of attorney made by said Blodget to said Union Trust Company on January 22, 1887, and accepts for his guidance and governance all the conditions and provisions and intendments thereof, and agrees that he will at all times and places be governed, controlled and directed in all affairs connected with or about said estate and concerns herein in any way alluded to by the said Union Trust Company and its proper officers and agents.

"And the said Morrison as such trustee, for the consideration aforesaid, and the recognized advantages hereof, for his successors and assigns, as well as for his heirs, executors and assigns, agrees that he will faithfully carry out and perform his said trust under the direction of the said Union Trust Company, and also all the parts and conditions of this agreement he will faithfully perform and keep, and further, that the Union Trust Company shall be his successor in the event that any transfer of the trust or powers which he has or may have under said deed from said heirs is made at any time, or in case at any time, a succession from any cause is necessary; and that he recognizes, consents to and affirms the said power of attorney made by said Blodget to said Union Trust Company on January 22, 1887, and accepts for his guidance and governance all the conditions, provisions and intendments thereof, and agrees that *he will at all times and places be governed, controlled and directed in all affairs connected with or about said estate and his said trust, in every part and particular, by the said United Trust Company* and its proper officers and agents, and this includes all matters whether of expense or otherwise, and make and render accounts to said company at least monthly, on the first day of each and every month of all his actions, doings and transactions, as such trustee or in any way or manner concerning said trust, with vouchers for all moneys had and expended, if any such at any time there be, and also at any time *to employ such attorneys, counsel or agents in the said matters of his said trust or any of them or concerning the same as the said*

*Union Trust Company or its officers shall request, desire, select or deem expedient to engage or employ,* and which may be deemed necessary by said trustee. And further the said Morrison, as trustee, &c., and for himself, &c., agrees that no property covered by his said deed of trust shall be conveyed by him or any other person by deed or otherwise to any person for any purpose without the written approval and consent of the said Union Trust Company as to the amount of purchase-money to be paid and the terms and conditions of such sale, or of any mortgage or incumbrance placed or put upon said property or any thereof to secure purchase-money.

"And the said Morrison as such trustee, and for his successors and assigns, and for himself, his heirs and assigns, does *empower and appoint the said Union Trust Company his true and lawful attorney to the same extent and as fully as the said Lorin Blodget has done in and by his power of attorney dated January 22, 1887, reference to which is hereby specially had,* to carry out the purposes, uses and conditions of his said trust as stated and intended by said deed made to said Morrison by said heirs, dated May 29, 1884, and agrees that he will deposit all funds and moneys arising out of and from his said trust with said company, for the use and benefit of the estate of which said Lorin Blodget is administrator. And for the consideration herein this is made irrevocable.

"And for its trouble and concern, and for full compensation in all these matters, the said Morrison agrees that the said Union Trust Company *shall retain to itself a sum of money equal to one-half of all the fees, commissions and allowances made by him as said trustee* by any court or tribunal, and he agrees so far as he may that if no allowance is made then the said Union Trust Company may *return to itself in and for full compensation a sum of money equal to two per cent. of the total amounts which may or shall come into the hands of said trust company through or by reason of the said trust or*

*any of the matters concerned herein,* provided the court allows said two per cent. to be taken out of said estate, but in no event is said Morrison to become personally liable to said trust company for said amount."

Indorsed upon this is an acceptance of "the obligations and duties imposed upon said company by the foregoing agreement and letter of attorney," duly signed by the Union Trust Company.

5. An indenture made by and between the said heirs of Samuel Blodget, deceased, and William F. Boogher, as parties of the first part, and Lorin Blodget, trustee, and Robert Morrison, trustee, parties of the second part, and John J. Johnson (plaintiff in this suit), party of the third part. This deed recites, first, the agreement between the heirs and Lorin Blodget of June 27, 1873, and then says:

"Whereas, it is the desire of the said parties of the first part, as well as the parties of the second part, *to make said deed, agreement and trust to the said Lorin Blodget operative and effectual to the fullest extent for the purpose therein specified and intended, and to which the said deed, agreement and trust, to said Blodget is made a part thereof."*

Among other recitals occur the following:

"Whereas, by a certain trust deed, bearing date on the 29th day of May, 1884, made by the next of kin and heirs-at-law of Samuel Blodget, Jr., and also by Lorin Blodget, of Philadelphia, Pennsylvania, for himself and as attorney-in-fact and trustee for the heirs-at-law and next of kin of Samuel Blodget, Jr., deceased, to Robert Morrison, of the city of Washington, D. C.; the said parties by said deed conveying, for valuable considerations, to said Robert Morrison, all their rights, titles, and interest whatever, in and to the several tracts of land, lots and property in said deed described. The land and lots in said deed described, being genetically known as "Jamaica tract" and in the said city of Washington, which said deed is executed, witnessed and acknowledged, and recorded.

" Whereas, on the eighth day of February, 1887, William F. Boogher and the said Robert Morrison, for himself and as trustee for the heirs and estate of Samuel Blodget, Jr., deceased, entered into a certain agreement with the Union Trust Company, a corporation duly organized under the laws of Pennsylvania, and which said agreement is duly recorded and made a part of this conveyance.

" And whereas, the said Robert Morrison has expressed the wish to retire from the trusteeship aforesaid and to relinquish all estate, rights and authority whatsoever vested in him by virtue of the said deed of trust, dated the 29th day of May A. D. 1884, unto any new trustee whom all parties desire should be placed in his stead.

" And whereas the said John J. Johnson, upon the solicitation of all parties in interest, has consented to accept the said trusteeship, upon the retirement of the said Robert Morrison, and carry out the objects, purposes and conditions of the trust, as hereafter declared and provided.

" And whereas it is agreed by the said Morrison, for himself and also in his capacity as trustee for all parties named in and covered by *each and all of the several deeds of trust, conveyances instruments, decrees or other things hereinbefore mentioned, or alluded to, and is by him made a part of the consideration for this deed of conveyance.* And further, that he will fully carry out the object and purposes of this deed, and to fully convey all his interest in the deed aforesaid as trustee or otherwise, he, the said Morrison, therefore, joins in the deed and executes the same."

Then, upon " a consideration of the premises and the further sum of $10," the parties of the first and second parts convey to the party of the third part (the plaintiff) all the estate, properties, etc., mentioned in the foregoing instruments, with specifications of the character of the same; the boundaries of the land and the immense number of the squares and lots into which it had been divided.

"In and upon these trusts nevertheless, that is to say, *in*

*trust for the sole use, benefit and behoof of the said parties of the
first part and the said parties of the second part as declared in
the trust to said Lorin Blodget of record aforesaid* and upon this
further trust, from time to time and at all times, to dispose
of, convey, acquit, and release the same or any part thereof
to such person or persons, to such use and purposes and in
such quantities and quality of estate or estates as in the
judgment of the said party of the third part shall seem meet
and proper in the best interests of all concerned ; and upon
this further trust to prosecute, sue for, recover and collect
said estate and claims and any and every part thereof, and
to convert the same into money, keeping an exact account of
all his transactions and of all moneys recovered by him,
which account shall be open and accessible to the inspection
of any and all the parties hereto, their agents or attorneys ;
and upon this further trust *to account for and pay over unto
the Union Trust Company* or its successors, *as per their contract
with Lorin Blodget,* trustee, bearing date the 22d day of
January, A. D. 1887, and duly recorded in the land records
of the District of Columbia, which for *greater certainty reference
is here had and made a part hereof,* all moneys that may or
shall come into his hands in the execution of his trust as
provided for and intended by the hereinbefore-recited deed,
agreement and trust, as soon as the same is received accord-
ing to the provisions of the said deed, agreement and trust,
which said *moneys shall be immediately distributed and paid by
said company to the several parties entitled thereto ; the heirs re-
ceiving one-half of the gross amount undiminished by any costs
or charges ;* and upon this further trust *if at any time it should
become necessary for a proper management of the estate,* or in the
*event of a vacancy in the trust either by death or otherwise,* power
is hereby given to the judge holding the equity court for the
District of Columbia, upon the application or petition of any
one in interest, the trust company herein named concurring
therein, or its successors, *to appoint a new trustee and the trustee*

4 Ct. App.—20

*so appointed is to hold under the same trust and power as his pre-decessor and none other, and with the like responsibility.*

"And the said parties of the first part, and the *said Lorin Blodget*, trustee, aforesaid, for themselves and each of them, their and each of their heirs, executors and administrators, do hereby covenant, promise and agree to and with the said party of the third part, his successors and assigns, that they, the said parties of the first and second parts, and their and each of their heirs and assigns, shall and will warrant and forever defend the said pieces, parcels, lots, squares and tracts of land; claims, rights and properties and premises and appurtenances, unto the said party of the third part, his heirs and assigns, from and against the claims of all persons claiming or to claim the same or any part thereof, by, from, under or through them or any of them."

The Union Trust Co. also endorsed on said deed its approval of the retirement of Morrison and his relinquishment of the trust to plaintiff.

6. On January 10, 1888, an indenture was made and executed between Lorin Blodget and William F. Boogher as parties of the first part, and John J. Johnson, trustee, as party of the second part, as follows :

"Whereas Julia A. Britton and others, heirs-at-law of Samuel Blodget, Junior, late of the city of Philadelphia aforesaid deceased, by agreement bearing date of 27th day of June, A. D. 1873, and recorded at Washington aforesaid, in Liber No. 731 folio 448 of land records, constituted and appointed the said Lorin Blodget, their attorney-in-fact for the prosecution, recovery and collection of their claims as heirs-at-law, of the said Samuel Blodget, Jr., deceased, as aforesaid, and did contract and agree that he, the said *Lorin Blodget, should be entitled to and have the one-half of all the proceeds of all property real and personal, which he, the said Lorin Blodgett, should recover under said agreement.* And whereas, the said Lorin Blodget, afterwards made and entered into an agreement with the said William F. Boogher,

bearing date on the 23rd day of March, A. D., 1882 and recorded at Washington aforesaid, in Liber No. 1057, folio 453, and in Liber No. 1230 folio 153, whereby he contracted and agreed in consideration of the services contemplated by said agreement to be rendered by the said William F. Boogher, in and about the recovery of said claims *to pay to him, the said William F. Boogher, the one-fourth of the amount, which might be collected of said claims,* being one-half part of his, the said Lorin Blodget's half of such collection or collections.

"And whereas, the said heirs-at-law and parties in interest in the said estate of Samuel Blodget Junior deceased, did by indenture bearing date the 29th day of May, A. D. 1884, duly recorded at Washington aforesaid, in Liber No. 1147 folio 295 of land records, grant and convey unto Robert Morrison of the said city of Washington, his heirs and assigns all their and each of their right, title and interest of in and to the said estate real and personal as therein recited in trust for the purpose of the recovery and collection thereof as therein stated.

"And whereas, the said heirs-at-law and parties in interest in said estate together with the said Robert Morrison trustee as aforesaid, afterwards by indenture bearing date the 10th day of June, A. D. 1887, and intended to be forthwith duly recorded at Washington aforesaid, did grant and convey all their said right, title and interest of in and to said estate of the said Samuel Blodget, Junior, deceased, unto the said John J. Johnson, as trustee to succeed the said Robert Morrison in said trust, as by reference to said indenture will more fully and at large appear.

" And whereas, the *said Lorin Blodget and William F. Boogher, have executed and issued under even date herewith 240 certificates to represent their joint one-half interest in the said estate real and personal of the said Samuel Blodget, Junior, deceased, at an estimated total value of $240,000, for said one-half interest,* each certificate being of the par or face value of

$1,000, and said certificates being numbered from 1 to 240 both inclusive respectively, and each certificate being in the following form countersigned by the said John J. Johnson, trustee, to wit:

"(No. —.)                                      ($1,000.)

" This is to certify that the bearer hereof is entitled to one share in one-half of the estate real and personal of Samuel Blodget Junior, late of the city of Philadelphia deceased, which estate is located in the city of Washington, and is now in the course of recovery and collection under the terms of a contract made by the heirs-at-law of the said Samuel Blodget Junior deceased, and Lorin Blodget, of the city of Philadelphia, dated June 27th.A. D. 1873, and recorded at Washington, aforesaid, in Liber No. 731 folio 448 &c., of land records and also under an agreement made by the said Lorin Blodget, with William F. Boogher, of Washington, aforesaid, dated March 23rd A. D. 1882, and recorded in Liber No. 1057 folio 453 and No. 1230 folio 153 of said land records, by which said contract and agreement the said Lorin Blodget, and said William F. Boogher, became, and are entitled to said one-half interest in said estate real and personal and have divided the said one-half into two hundred and forty shares of the par value of one thousand dollars each, of which said division this certificate represents one share and the holder hereof is entitled to a one equal two-hundred-and-fortieth part of the said one-half of said estate, real and personal of the said Samuel Blodget, Junior deceased, or the proceeds thereof.   This certificate is one of a series of two hundred and forty, and is secured upon a one-half interest in the real estate of the said Samuel Blodget Junior deceased, or the proceeds thereof by an agreement of even date herewith and intended to be forthwith duly recorded at Washington aforesaid, made by and between the said Lorin Blodget and William F. Boogher, of the first part and John J. Johnson, of Washington, aforesaid, trustee holding the legal title to said real estate and is also

entitled to its *pro rata* division of the said one-half of said personal estate, under the terms of said agreement, intended to be forthwith duly recorded as aforesaid.

"In testimony whereof, we have hereunto set our hands and seals, this tenth day of January A. D. 1888.

LORIN BLODGET. [SEAL]

WILLIAM F. BOOGHER. [SEAL]

Countersigned :

JOHN J. JOHNSON, *Trustee.* [SEAL]

" *The payment of which certificates according to their pro rata share in the said one-half of the estate, real and personal of the said Samuel Blodget, Junior deceased, is intended to be hereby secured.*

" Now this indenture witnesseth, that the said parties of the first part, in consideration of the premises and of the sum of one dollar lawful money of the United States unto them in hand well and truly paid by the said party of the second part, the receipt whereof is hereby acknowledged, have granted, bargained, sold, conveyed, assigned, transferred and set over unto him, the said party of the second, part, his heirs, executors, administrators and assigns, all their and each of their right, title, interest, property, claim and demand, of in and to the said estate real and personal of the said Samuel Blodget, Junior deceased, being the one equal moiety or half part thereof as aforesaid, to hold the same to the said party of the second part his heirs, executors, administrators and assigns to and for the only proper use, benefit and behoof, of the said party of the second part, his heirs, executors, administrators and assigns forever, in trust nevertheless for the uses and upon the following trusts and conditions, that is to say:

" First. *For the uses and purposes set forth in the said deed of conveyance made by the said parties in interest as aforesaid, to the said party of the second part,* his heirs, and assigns, bearing date the 10th day of June 1887, as aforesaid, and

"Second. *To hold, distribute, divide and pay over,* or cause to

be paid over the said one-half part of said estate, real and personal and the proceeds thereof from time to time, to and among the *respective owners of said two hundred and forty certificates pro rata and according to their respective holdings*, each share or certificate as aforesaid, representing a one equal 240th part of such divisions and payments.

" And the said party of the second part for himself, his heirs, executors, administrators and assigns, does hereby covenant and agree that he will faithfully carry out the provisions of this trust and pay over or cause to be paid over said proceeds of said estate, real and personal from time to time, the holders for the time being of said two hundred and forty certificates according to their respective holdings, as aforesaid."

Sept. 6, 1888, Lorin Blodget, Boogher and Johnson, trustee, entered into another agreement, reciting that the terms of the foregoing instrument do not in one respect express the true intention of the parties, and that this is made to correct it. It expressly provides that the $240,000 of certificates shall not be a lien on any of the real estate, but only on the proceeds to be paid to the Union Trust Co. for distribution by it to the holders of said certificates. Johnson *covenants to pay over all proceeds of sales, settlements and recoveries to the said Trust Co.* The instrument also provides that " *in all other respects the said agreement is reaffirmed* "— the reference is to the next preceeding one—and that the heirs are to receive " *one-half of the gross amounts undiminished by any costs or charges.*"

The plaintiff's deed and accompanying papers having been excluded, he declined to take a nonsuit, and the jury found for the defendant. Motion for new trial was overruled, and judgment entered upon the verdict, from which this appeal has been formally prosecuted.

*Mr. W. H. Armstrong* and *Mr. J. J. Johnson* for the appellant:

At common law " *maintenance* " is defined to be " an

officious intermeddling in a suit that nowise belongs to one, by maintaining or assisting either party with money or otherwise to promote or defend." "*Champerty*" is a species of maintenance, being a bargain with a plaintiff or defendant to divide the land or other matter being sued for between them if they prevail at law ; whereupon the champertor is to carry on the suit at his own expense. *Manning* v. *Sprague*, 148 Mass. 20.

If any champerty exists in this case it must be found in the contract of Lorin Blodget in 1873. The utmost that can be said of the Johnson deed is that it recognizes and confirms that contract. If that contract is not champertous there is no champerty in the case ; but if it is, it is contended by the plaintff : 1st. That it does not vitiate the conveyance of the legal title to the trustee nor render the deed void. 2d. That it would be good as a conveyance even if held void as to any champertous covenant therein when such question arises between the proper parties. 3d. That this defendant could not avail herself of such defense, and a court of law could not entertain it in this action, as it is necessarily executory and the subject of only equitable inquiry.

Not only by the accepted definition, but by the whole current of authorities in England, where the doctrine originated, and by the uniform decisions in the States where it is recognized, the ground upon which it has been sustained, in any case, has been that the single purpose of the contract was to "carry on the suit." There is no case in which a contract has been held to be champertous in which, as in this case, it provides for the personal services of an agent and attorney-in-fact, as trustee to marshal the assets of an entire estate, with obligation to keep books, open to the inspection of contracting parties, which shall show all the transactions of the trustee and all moneys received, and to file an annual "trust account" if required, to make contracts of sale and leases, with authority to bring

suits at law or in equity, to settle and adjust all claims, dealing with the estate as " in his judgment the interests of of the heirs " might require.   The bringing of suits was not the purpose but the incident of this agency and trust.   The power was necessarily conferred to be exercised if necessary, but it was not obligatory unless as a last resort in the due execution of the trust.

There is nothing in the transaction which impeaches its honesty.   That the heirs were to receive their share undiminished by expenses is neither unusual nor dishonest nor in violation of any policy of the law.   It operated only to diminish the ultimate interest of Lorin Blodget and obviate the otherwise imperative necessity of collecting assessments for expenses from the widely scattered heirs, some of whom, being well advanced in years, would in the course of nature soon be dead and their proportion of expenses be collected from new heirs, some of whom would certainly be minors. The *bona fides* of the transaction have never been questioned.

From the standpoint of Lorin Blodget the purpose of the instrument was to define the rights secured to him in consideration of and as compensation for services under his general agency.   It is not an agreement for an interest in the thing to be recovered contingent on success.   It is a grant of a right vested *in præsenti*, and in no way contingent on success or on any other contingency, either precedent or subsequent.   It is fair and conscionable under the circumstances.   The subject matter of this agreement is not founded upon speculation nor upon a pretended title, but upon a fair and proper prosecution of rights well supported by evidence.

But Lorin Blodget was not a party to this ejectment and the defendant was not a party to the alleged champertous contract and it in nowise concerned her.   The action was not to enforce a pretended title nor one derived from a champertous contract.   The deed was good to vest the legal

estate in the trustee, even if the contract with Lorin Blodget was void. It is familiar law that if there be several considerations for a contract, one of which is illegal, that only will be inoperative, and the remaining considerations will support the contract. 1 Wharton on Contracts, Par. 338. In this case the consideration expressed is ten dollars paid by the trustee to each of the several grantors, whilst it is plain that the covenants of the trust are of themselves a sufficient consideration for the conveyance of the legal title. No compensation whatever is expressed for the trustee nor any stipulation as to payment of costs. The first rests wholly upon a *quantum meruit* and the second would follow the judgment as in other cases. The alleged champerty in the deed is altogether apart from the consideration of the conveyance.

To hold that the contract of 1873 is champertous, and especially to hold that its mere recital and approval in the deed of 1887 renders that whole conveyance, made upon other and distinct considerations, void, is to carry a doctrine of admittedly doubtful value beyond the utmost limit of its utility and far beyond the line of any adjudicated case.

But assuming that the contract was champertous, it was not competent for the defendant to object to the deed upon that ground. It was an executory contract, which, if unlawful, the heirs could repudiate, and which the defendant had no right to assume must necessarily be finally executed by them. The action was not upon the champertous contract, nor upon any such covenant of the deed, nor were the parties to be affected by it within the jurisdiction of the court. There is no case in which a defendant has been allowed to defend his possession against the legal title upon any such ground. The decisions are uniformly against it, even in the States where the doctrine is recognized. *Burns* v. *Scott,* 117 U. S. 583 ; *Courtright* v. *Burns,* 3 McCreary, 60 ; *Keller* v. *Blanchard,* 21 La. 38 ; *Boon* v. *Chiles,* 10 Pet. 177 ; *Allison* v. *RR. Co.,* 42 Iowa, 274 ; *Robinson* v. *Beall,* 26 Ga. 1 ; *Brinley* v. *Whiting,* 5 Pick. 348 ; *Whiting* v. *Kirtland,* 27

N. J. Eq. 333; *Roberts* v. *Cooper*, 20 How. 467; *Thallheimer* v. *Bounkerhoff*, 3 Cow. 623.

That the alleged champertous contract is executory only cannot be doubted. The rights, if any, to be held under such contract are the proper subject of equitable consideration only and cannot be considered in a court of law nor be set up under any pretense whatever as a defense in an action of ejectment upon a legal title. The authorities upon this subject are too numerous and uniform to require citation.

*Mr. W. F. Mattingly* for the appellee:

While the decisions as to champerty have been greatly modified, yet when a contract is clearly champertous it is still held void and will not be enforced. The doctrine prevails in this jurisdiction. *Stanton* v. *Haskin*, 1 MacArthur, 558; 3 Am. & Eng. Ency. of Law, 86; *Matthews* v. *Hevner*, 2 App. D. C. 349.

The most liberal modern doctrine is well stated by the court in *Brown* v. *Bigne*, 28 Pac. Rep. 11, in which, while the court says that an agreement to furnish aid in a suit and to divide the thing recovered ought not to be held as void *per se*, it further says that when such contracts are made for the purpose of stirring up strife and litigation, harassing others, inducing suits to be begun which otherwise would not be commenced, or for speculation, they come within the analogy and principles of that doctrine and should not be enforced. *Gilbert* v. *Holmes*, 64 Ill. 548; *The Mohawk*, 8 Wall. 153; *Boardman* v. *Thompson*, 25 Iowa, 487.

This ejectment is based upon this deed to the plaintiff, and to maintain the action it is essential that the deed should be free from taint and one that a court could enforce. The plaintiff, the grantee in the deed, is not a mere holder of the naked legal title to the land, but is a party to the speculative scheme by which utter strangers to the parties and the title are brought in to gamble in the litigation. This action is to enforce that deed and cannot be sustained.

*Hilton* v. *Wood,* L. R. 4 Eq. 432; *Elborough* v. *Ayers,* L. R. 10 Eq. 373; *Stanley* v. *Jones,* 20 E. C. L. 369; *Duke* v. *Harper,* 66 Mo. 51.

But independent of any question of technical champerty this deed is void as against public policy. On its face it undertakes to convey about 500 acres of land in the heart of the city, shown to be in the possession of numerous persons under a claim of ownership which had lain dormant for three-quarters of a century; provides for the issue of $240,000 in stock certificates, by the sale of which money is to be raised to pay the costs of suits to be instituted and conducted by the agent of the holders, who are to receive one-half of what is recovered. It is a regular gambling game in speculative ejectment suits and the timidity of land owners, in which the court is required to act as banker. The simple question in the case is, will it?

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The first question to be considered is: Do the recitals of the deed, contracts and trusts, which make up plaintiff's claim of title, show forth the existence of champerty? " Champerty is the unlawful maintenance of a suit in consideration of an agreement to have a part of the thing in dispute." 1 Hawk. P. C. 545; Co. Litt. 368. It has also been defined to be " a bargain to divide the land or thing in dispute on condition of his carrying it on at his own expense." *Stanley* v. *Jones,* 7 Bing. 369. These definitions have been very generally approved. *Roberts* v. *Cooper,* 20 How. 467; *Brown* v. *Beauchamp,* 5 T. B. Mon. 415.

The offences of maintenance and champerty and the docrine of the invalidity of contracts on account thereof, did not have their origin solely in the statutes of Edward I and III, which provided special penalties therefor. Lord Ellenborough is authority for saying that maintenance was always considered *malum in se.* *Wallis* v. *Duke of Portland,* 3 Ves. Jr. 494. See also *Brown* v. *Beauchamp,* 5 T. B. Mon. 415, citing

2 Inst. 208–212.   And it has generally been held that these statutes were declaratory only of the common law.   *Pechell* v. *Watson*, 8 M. & W. 691; 4 Bl. Com. 135; *Thurston* v. *Percival*, 1 Pick. 415; *Backus* v. *Byron*, 4 Mich. 535; *Arden* v. *Patterson*, 5 Johns. Ch. 44; *Boardman* v. *Thompson*, 25 Iowa, 487; *Thompson* v. *Reynolds*, 73 Ill. 11; *Gilbert* v. *Holmes*, 64 Ill. 548; *Barker* v. *Barker*, 14 Wis. 142; *Weakley* v. *Hall*, 13 Ohio, 167; 2 Story Eq. Jur., Sec. 1048.

The same may be said of the statute of 32 Hen. VIII, prohibiting conveyances and agreements with respect to lands between parties neither of whom have had possession for a limited period, and providing severe penalties therefor, in a further effort to correct the evils of maintenance and champerty.   Lord Chancellor Eldon declared this to be the object and effect of that act in his advisory opinion to the House of Lords in the famous case of *Lord Cholmondeley* v. *Clinton*, 4 Bligh. 1, in the course of which he quoted with approval this passage from a case reported in 1 Plowd. 88; "This statute was made in affirmance of the common law and not in alteration of it, and all that the statute has done is, it has added a greater penalty to that which was contrary to the common law."

We are of the opinion that the contracts and combinations exposed in the recitals of the instruments under consideration are not only clearly within the provisions of those old statutes, but also as clearly against the policy of the older common law, to which they only added sanction with increasing penalties.

The original contractor with the heirs, Lorin Blodget, whose contract is retained and carefully guarded throughout the whole chain of instruments, not only undertook to secure a one-half interest in the things to be recovered by suit, but also covenanted to institute the necessary suits and to maintain them diligently entirely at his own cost and expense. He then brought in others to assist in his scheme, and later on organized a trust or syndicate or lottery (whichever it

may appropriately be called), the sole asset of which consists of his prospective share of the results of the proposed litigation, capitalized in the sum of $240,000, and represented by certificates of the face value of $1,000 each, which are to be issued and disposed of to raise funds for the prosecution. The original contract necessarily implied the institution of the suits in the names of the contracting heirs at law of Samuel Blodget. But to facilitate the institution and conduct of suits and the management of the business generally, and, no doubt, to guard the interests of each and everyone of the shareholders, as well as to provide a speedy, inexpensive and thorough mode of conversion and distribution of all recoveries, the conveyance to the common trustee was devised. Thus a permanent executive officer was created, to whom all titles were passed, and in whose name all proceedings are to be taken ; a permanent and responsible treasurer—the Union Trust Company—was provided for, to hold and disburse the moneys received. The corporation idea was completely developed. Lorin Blodget and the contracting heirs may die or part with their remaining interests, certificate holders may die or assign, but the trust will go on unchanged and unending until the last claim of the estate of Samuel Blodget shall be reduced, converted into cash, and distributed.

2. It may now be considered to what extent, if any, the Statutes of Edward I and III, and of 32 Hen. VIII, and the policy of the common law against champerty and maintenance may prevail in this jurisdiction. It may be admitted that all of these statutes became obsolete in Maryland before the cession of the District of Columbia ; they certainly had become so later, as was held in *Schaferman* v. *O'Brien*, 28 Md. 565, decided in 1868. That case has been followed by us in one where the naked question was presented, whether a deed made by one out of possession, both actual and constructive, is void by reason of the prohibition of the statute of 32 Henry VIII. *Matthews* v. *Hevner*, 3

App. D. C. 349. But Mr. Justice Morris, who delivered the opinion of the court, was careful to limit the decision to the question as presented, and in doing so he took occasion to say : " We do not desire to be understood, however, as holding that champerty and maintenance are no longer reprehensible or criminal under our laws; or, as was intimated in *Schaferman* v. *O'Brien*, that there may not be cases where the purpose of the parties to stir up litigation is so plain that their acts should be regarded as void."

In *Stanton* v. *Haskin*, 1 MacArthur, 558, decided in 1874, the General Term of the Supreme Court of the District refused specific performance of a contract between attorney and client for a one-third interest in land to be (and which was) recovered in litigation maintained in accordance therewith. The court also expressed the opinion that, " with some modifications, the common law with regard to champerty, which is supposed to be founded on the statute of 28 Edw. I, is generally recognized." This seems to be the only case in which the question has ever been discussed or alluded to in the courts of this District.

It must be admitted, though not to the extent claimed on behalf of appellant, that the conditions prevailing in our country and in our times are so different from those existing in the days when the doctrine of champerty had its origin and was rigidly enforced, that the chief reasons for the existence of the rule have passed away entirely, whilst others have lost or largely spent their force. Modifications and exceptions to the rule were early recognized in England, and have grown and increased there, and, generally in greater degree, in this country. Acts of assistance and upholding of litigation were gradually recognized as justifiable when prompted solely by charity to the poor and unfortunate who might else be unable to right a wrong ; by the ties and obligations of consanguinity, affinity, or common interest ; by the relations of landlord and tenant, master and servant, neighbor and neighbor, and attorney and client. The

recognized relations of attorney and client have resulted in the complete recognition of the legality of contingent fees. *Wylie* v. *Coxe*, 15 How. 415; *Wright* v. *Tibbetts*, 91 U. S. 252; *Stanton* v. *Embrey*, 93 U. S. 548; *Taylor* v. *Bemiss*, 110 U. S. 42. We have heard of no case, however, where such contracts have been enforced when they contained a covenant by the attorney to prosecute the cause at his own cost. In the foregoing cases no such covenant appeared, and in no one of them was proof made that they were obtained unfairly or an undue advantage taken of the relation of attorney and client. Notwithstanding the changed conditions that have begotten certain changes in public policy, we (as intimated above) cannot admit that all the reasons which formerly operated against the recognition and toleration of champertous contracts have ceased to exist.

Unnecessary and speculative litigation, the promotion of inexcusable strife, the vexation of landholders and the laying of embargoes on the free alienation of their holdings, are as pernicious now as they ever were and as needful of redress. Contracts which tend to promote these evils are as much opposed to sound public policy as they ever were, and therefore ought not to be enforced. The distinction between contracts in aid of litigation which ought to be enforced and those which ought not, is well drawn in the case of *Brown* v. *Bigne*, 21 Ore. 260. This was a suit on a contract made between Bigne, who was engaged in a necessary and meritorious suit and had no means with which to further prosecute it, and Brown, who furnished the necessary funds upon Bigne's agreement to give him one-half the proceeds. The court found that the contract was fairly and freely made, and had been performed by Brown in good faith, and upheld it as untainted by champerty, but at the same time said: "When such contracts are made for the purpose of stirring up strife and litigation, harassing others, inducing suits to be begun which otherwise would not be, or for speculation, they come within the analogy and principles of that doctrine, and

should not be enforced." There is a clear analogy between contracts of this nature and those for the purchase of a naked right to bring an action at law or in equity, which have generally, if not universally, been held void as against public policy. In the case of *De Hoghton* v. *Money*, L. R. 2 Ch. App. 164, it was held "that such a transaction, if not in strictness amounting to maintenance, savors too much of it for this court to give its aid to enforce the agreement." *Traer* v. *Clews*, 115 U. S. 528. In this case the court drew the distinction clearly between the assignment of the mere right to file a bill in equity for a fraud that had been committed, which it was declared would be void " as contrary to public policy and savoring of maintenance," and the conveyance of the property itself, "where the fact that the grantee may be compelled to bring a suit to enforce his right to the property, does not render his conveyance void."

We would not pursue the discussion further on this line but for the earnest contention of the appellant that in the absence of an express statute these contracts, or the cause of action based thereon, if really involved, cannot be affected or refused enforcement on the grounds of public policy alone. The grounds of this contention are without merit. As we have seen above, champerty was regarded as an offense at common law before the statutes were adopted, and as a thing *malum in se*. From the earliest times the courts have declared contracts void because opposed to public policy. Why should these be exceptions to the rule? "All contracts or agreements which have for their object anything which is repugnant to justice, or against the general policy of the common law, or contrary to the provisions of any statute, are void, and whenever a contract or agreement is entered into with a view to contravene any of these general principles, there is no form of words, however artfully introduced or omitted, which can prevent courts of law and equity from investigating the truth of the transaction; for *ex turpi contractu actio non oritur* is a rule both in law and in

equity." 1 Comyn. Cont. 30. See *Boardman* v. *Thompson*, 25 Iowa, 487; *Kennett* v. *Chambers*, 14 How. 38. This last case was a suit to enforce a contract for the sale of lands in Texas between Chambers, the owner, who was an officer in the service of the Republic of Texas, and complainants, who were citizens of Ohio. The moneys advanced on the contract were to be used in aid of the war for Texan independence. The contract was made and the money paid in Ohio before the independence of Texas was recognized by the Government of the United States. The bill was filed in the United States Circuit Court for the District of Texas some years after the admission of that State into the Union, which dismissed it, and that decree was affirmed on appeal therefrom. The decision was not made to rest upon any statute or treaty of the United States. As said by Chief Justice Taney : " The decision stands on broader and firmer grounds, and this agreement cannot be sustained either at law or in equity. The question is not whether the parties to this contract violated the neutrality laws of the United States or subjected themselves to a criminal prosecution ; but whether such a contract, made at that time within the United States, for the purposes stated in the contract and the bill of complaint, was a legal and valid contract, and such as to entitle either party to the aid of the courts of justice of the United States to enforce its execution." See also *Oscanyan* v. *Arms Co.*, 103 U. S. 261; *Irwin* v. *Williar*, 110 U. S. 499.

If this suit were for the express purpose of testing the validity of these contracts and obligations, there could be no doubt of the result. In England the rule denying the enforcement of such contracts has been uniformly adhered to. In *Powell* v. *Knowler*, 2 Atk. 224, decided in 1741, enforcement was denied a contract which the court said was " evidently artfully drawn to keep it out of the statute of champerty." In *Wood* v. *Downes*, 18 Ves., Jr., 120, a contract with an attorney was set aside on a bill for that purpose. In his opinion therein, Lord Eldon quoted with express

approval a declaration of Lord Northington in *Strachan* v. *Brander*, 1 Eden, 303, to this effect: "The transaction [by which a fund had been raised to carry on litigation], though not strictly champerty, was so near that it could not be permitted to prevail; it savors of champerty, and is therefore dangerous to public justice." See also *Stevens* v. *Bagwell*, 15 Ves., Jr., 139; *De Hoghton* v. *Money*, L. R. 2 Ch. App. 164; *Ram* v. *Chunder*, L. R. 2 App. Cas. 186. This last case was an action for damages and costs incurred in a law suit vexatiously carried on against plaintiff through a contract between defendant and another, and came before the House of Lords on appeal from India. It was held that the laws against maintenance and champerty did not prevail in India, wherefore fair agreements to furnish funds to carry on litigation in consideration of a share of the property are not *per se* void. But it was said in connection therewith (page 209): "It seems clear that contracts of this nature ought, under certain circumstances, to be held invalid as being against public policy." *Stanton* v. *Haskin*, 1 MacA. 559, and some other American cases have been heretofore cited and others will be referred to later.

Without undertaking to define limits or specify all exceptions that may be recognized, we hold that a purely champertous contract, or one which savors so strongly of champerty and public mischief as the one under consideration, is against sound public policy, and ought not to be enforced in the District of Columbia. Contracts for the prosecution of harassing litigation, which would not otherwise be instituted, and upon speculation in a spirit of gambling, shares in which may be thrown upon the market to be disposed of to chance buyers, like tickets in a lottery, ought to receive the condemnation of the courts of this District when brought to their attention in a proper manner. To encourage the formation of syndicates or trusts for the purpose of maintaining litigation like this—for this is but one of a series that may be instituted at any time for the recovery of lots

throughout the boundaries of the old "Jamaica" tract of 494 acres—could have none but a most mischievous effect. Once legalize them or give them the slightest approval, and in these times of feverish speculation and marked propensity for gambling enterprises which promise great returns for small investments, we may, not unreasonably, expect to see similar joint stock associations formed for the express purpose of maintaining law suits throughout the land, thereby vexing the people, crippling their enterprises, interfering with the growth and development of country and cities, and producing other and great mischiefs.

3. It does not follow, however, that every champertous contract incidentally connected with the title or thing in controversy can be brought within the grasp of the court therein. There may be other distinct and controlling considerations. It is now generally held that where a party has a right or a title he cannot be debarred from its prosecution by reason of an incidental contract concerning the same which may be unlawful or against public policy, because this would be equivalent to a forfeiture of title. The practical effect would be to divest the title of the true owner and vest it in his disseizor. *Brinley* v. *Whiting,* 5 Pick. 348 ; *Robison* v. *Beall,* 26 Ga. 17 ; *Allison* v. *C. & N. W. R.R. Co.,* 42 Iowa, 274 ; *McMullen* v. *Guest,* 6 Tex. 275 ; *Hilton* v. *Wood,* L. R. 4 Eq. 432. It is true that a contrary rule prevails in some States (*Barker* v. *Barker,* 14 Wis. 142 ; *Allard* v. *Lamirande,* 29 Wis. 502 ; *Cardwell* v. *Sprigg's Heirs,* 7 Dana (Ky.), 36 ; *Harmon* v. *Brewster,* 7 Bush. 355) ; but the question may be regarded as firmly settled, as far as we are concerned, by the Supreme Court of the United States. *Boone* v. *Chiles,* 10 Pet. 177 ; *Burnes* v. *Scott,* 117 U. S. 582.

The difficulty in this case is that it does not present that aspect entirely. The suit is not by and in the names of the heirs of Samuel Blodget. If this were the case we would be constrained to hold that collateral contracts, though tainted with champerty, could not be brought to the attention of

the court by plea or otherwise, so as to bar the right of action.

It becomes necessary now to notice the contention of appellant, that, granting the existence of champerty, the deed to Johnson is good as a conveyance by the heirs of the legal title, notwithstanding all other provisions thereof may be rejected. The proposition is that, " where there are several stipulations in a particular agreement, and *one is illegal*, it does not defeat the others when they are divisible, and the consideration as a whole is not illegal." Without pausing to affirm or deny the soundness of this proposition, quoted from Wharton on Contracts, we deny its application to the papers offered in evidence in this case. The stipulations and provisions of these contracts are not divisible; they are and were clearly meant to be inseparable. The " consideration as a whole" is illegal. It is the maintenance of this and other contemplated suits for the benefit of all, but at the expense and through the efforts exclusively of Lorin Blodget and his assignees. The recited additional consideration of " ten dollars" is purely nominal, and cannot be regarded as a consideration to support the contract or deed, separated from the real and main one. It was not intended to confer a shadow of title upon the grantee save for the purposes of the trust. These are the moving considerations, and it is in their conditions that the illegality lies. They cover in their recitals each and every instrument or contract in the series. They cannot be rejected without destroying the whole scheme, and every purpose of the conveyance, and vesting in Johnson a title which it cannot be pretended was within the contemplation of any one who executed it or is interested in its operation. The deed must therefore be taken as a whole and in connection with each instrument referred to and made a part of it. The heirs of Samuel Blodget have mingled and bound up their claim, if a just one, with the interests of Lorin Blodget and the certificate holders in the champertous trust organized by him. These rights and interests are inseparable in the action as

brought.   The trustees' recovery inures to the benefit of all alike.   If we hold them barred of their right to recover in this action the heirs of Samuel Blodget have themselves alone to blame.   It may be added, too, that dismissing this action will not bar any action they may see proper to maintain when they shall have withdrawn from the illegal contract with Lorin Blodget and his associates.   If they suffer it will be the consequence of mingling a just and legal claim with a bad one so that they cannot be separated.   This would be in strict accord with the doctrine of *Trist* v. *Child*, 21 Wall. 441, where a suit was brought upon a claim for legal services mingled with "lobby" service in prosecuting a claim before Congress.   In denying recovery Mr. Justice Swayne said : " We have said that for professional services in this connection a just compensation may be recovered. But where they are blinded and confused with those which are forbidden the whole is a unit and indivisible.   That which is bad destroys that which is good, and they perish together."

This suit cannot be maintained without we give our approval to the unlawful contracts which enter into and form a part of the plaintiff's claim of title.   These are not collateral matters sought to be forced on our attention by plea or motion or affidavit ; they inhere in the title itself, and must be given effect if plaintiff be permitted to recover thereon. Whilst the point is not without grave and serious difficulty in the absence of direct and binding authority, we nevertheless think that upon principle it should be resolved against the appellant, and this conclusion has support in decisions of courts of high authority made in cases which are analogous.   *Hilton* v. *Wood*, L. R. 4 Eq. 432 ; *Elborough* v. *Ayres*, L. R. 10 Eq. 367 ; *Harrington* v. *Long*, 2 Mylne & K. 590 ; *Bayly* v. *Tyrrell*, 2 Ball & Beaty, 358 ; *Ld. Cholmondeley* v. *Clinton*, 4 Bligh. 1 ; *Saylor* v. *Stuart*, 2 Heis. (Tenn.) 510.

In *Hilton* v. *Wood*, the plaintiff enjoined defendant from

mining coal in land belonging to him, and asked for an account for that which had been before taken out. Plaintiff had been in ignorance of his rights in the premises until informed by a solicitor named Wright. He made a contract with Wright by which the latter guaranteed plaintiff against all costs, and in consideration was to share the proceeds of the recovery. The champertous contract was brought to the attention of the court by affidavit. The vice-chancellor held that the champertous contract could not be introduced for the purpose of depriving plaintiff of his action, but said: "I have carefully examined all the authorities which were referred to in support of this argument, and they clearly establish that whenever the right of the plaintiff, in respect of which he sues, is derived under a title founded in champerty and maintenance, his suit will on that account necessarily fail. But no authority was cited, nor have I met with any which goes to the length of deciding that where a plaintiff has an original and good title to property he becomes disqualified to sue for it by having entered into an improper bargain with his solicitor as to the mode of remunerating him for his professional services in the suit or otherwise. It is clear that the bargain between plaintiff and Mr. Wright amounted to maintenance, and if the latter had been the plaintiff, suing by virtue of a title claimed under that contract, it would have been my duty to dismiss his bill." As it was, however, costs were denied plaintiff, because as under the contract they were payable by Wright, recovery thereof would inure to his benefit.

*Elborough* v. *Ayres* is not itself in point, but in the opinion, James, V. C., relates a case tried before V. C. Wigram, of *Evans* v. *Protheroe* (not reported), in which the plaintiff, suing upon a title acquired through champerty, had been turned out of court. In *Harrington* v. *Long*, one Milligan had obtained a decree on a bill filed as a creditor of Long, the deceased testator. A supplemental bill was filed by Harrington and the original plaintiff, Milligan, against Sarah

Long, executrix, alleging that she had proved the will of testator since said decree, and asking to set aside a certain deed made to her by the testator five days before his death when in a state of mental incapacity, as fraudulent and void as to creditors. The bill alleged that Milligan, after proving his debt before the master, under the decree, had assigned the same to Harrington, with whom he joined as coplaintiff in this supplemental proceeding. The Master of the Rolls (Sir John Leach) held that the mere assignment of the debt was not maintenance; but upon inspection of the contract between the parties and discovery that the assignee had given the assignor an indemnity against all costs, for the purpose of prosecuting the suit, he dismissed the bill for the champerty. This decree was affirmed by the Lord Chancellor.

*Bayly* v. *Tyrrell* is a case of this kind : Joseph Tyrrell was the owner of an interest in land, the possession of which was withheld from him by his brother William for a claim charged thereon in his favor in partition proceedings, but under no claim of adverse title. In 1790 Joseph executed a lease of the premises to Bayly, who was an attorney. In 1791 he filed a bill against William praying a decree for possession, and, becoming embarrassed, he agreed with Bayly for a material abatement in the rent in consideration of the latter's advance of £50 to bring the case to a hearing. Joseph died pending the suit, and his heir at law refused to continue it. Bayly then filed his bill to recover possession, and for an account for rent from the commencement of his lease. Because the transaction was against public policy the bill was dismissed without prejudice to his right to sue at law for the non-performance of the agreement.

The case of *Lord Cholmondeley* v. *Clinton* was very much argued and finally concluded in the House of Lords. The two plaintiffs, Lord Cholmondeley and Mrs. Damer, joined in the bill, though their claims were adverse to each other, for one claimed the whole as heir at law of Horatio, Earl of

Oxford, while the other claimed the whole as devisee of the same. The bill contained this recital: "Some questions had arisen between the plaintiffs respecting the will and codicil of Horatio, Earl of Oxford, so far as regards the equity of redemption of the said mortgages, hereditaments, etc., and in order to put an end to such questions, they had agreed to share the same between them." Lord Eldon said: "This agreement was one that a court could not overlook even if the parties so wished." In his opinion to the Lords, Lord Redesdale denounced the agreement, and referring to the inconsistency of the claims of the plaintiffs, said : " To avoid that inconsistency they state this agreement, which is contrary to law, and which you are bound to destroy." 4 Bing. 123–4. *Saylor* v. *Stuart* is a case directly in point, though it is evidently based upon a statute of Tennessee relating to maintenance and champerty, which is not recited in the report of the case. It would not seem, however, to affect the principle. The action to recover land was brought in both the names of the grantor and grantee in a champertous deed. The court said that had the grantor brought the suit alone or had there been a separate count for recovery in his name alone, the champertous deed to his grantor, being void therefor, could not have been relied on to defeat his recovery. " But seeking in a single count to recover in the joint names of the grantor and grantee, the champertous contract made by one of the parties affects both, and is fatal to the whole suit."

We are not unmindful of the injury which may be suffered by the heirs of Samuel Blodget through our judgment, if indeed they have a good title to their lands, which may be affected only by adverse possession. But the injury is the result of their own deliberate conduct. Public policy looks beyond and far higher than the mere interests or inconvenience of parties.

It follows that *the judgment must be affirmed; and it is so ordered, with costs to the appellee.*