Bissell, P. J.
Of all the cases cited to the point of the invalidity of contracts because against good morals and public policy none appear to have been more fully impregnated with the destructive virus than this transaction. It wholly concerned the interest and title which A. W. Rucker was asserting against J. B. Wheeler. According to the plaintiff’s testimony the negotiations were begun by Rucker and carried to a conclusion by whomsoever acted entirely in his behalf. It would be impossible to either state or argue the case without a consideration of his relations to it, and the part he took in it. The subject of the barter was what Young had to sell and what Rucker wanted to buy. Whatever may have been Judge Thomson’s connection with the affair, whether we accept Young’s contention that he was his attorney or the more probable theory that he was Rucker’s representative at that time as it is conceded he became later, he acted only in a representative capacity, — he was an attorney and acted as such.
In July, 1888, the title to a particular one-sixth interest in the Aspen mine in Pitkin county stood in the name of J. B. Wheeler. This interest had theretofore been conveyed to him by Young for a large money consideration. The conditions at the time of this transfer were peculiar and have great significance as applied to the present suit. Young either had an absolute title when he conveyed, or a contingent one *296 which ripened into a fee. Either in or prior to November, 1884, Young then holding this title, bonded it to Rucker by a contract apparently maturing on the 19th of that month. Disregarding this contract, or on the assumption of Rucker’s failure to perform, Young deeded to Wheeler. It is conceded, or at all events it is not disputed, Wheeler took a good title unless he bought with notice and knowledge of the outstanding bond and the obligee had legally tendered performance. This the obligee always insisted on and for years had been hunting for evidence to enable him to successfully prosecute a suit against Wheeler and compel him to convey this interest and account for its product. The mine had,proven to be of great value. Enormous quantities of valuable ore had been taken out of it, and the original judgment in the suit against Wheeler amounted to several hundred thousand dollars. This evidence was still lacking-in .July, 1888, when the contract, set up as the subject-matter of this suit, was entered into. The term “ contract ” is used advisedly because the answer concedes a contract was made. The dispute only concerns its terms and the parties to it. We are unable to state what the contract was except as its conditions can be extracted from Young’s testimony. As alleged it was denied. As stated in the answer it was denied by Young in his testimony. No other evidence was given. At the conclusion of the testimony the defendant moved for a nonsuit which was granted and therefrom this error is prosecuted. We shall state the case as thus made, as we understand it, with the inferences and conclusions which we conceive can be legitimately drawn from it. • Rucker apparently thought Young who had been Wheeler’s partner, as well as grantor, must have some knowledge or possess some documents which would avail to support his contention that Wheeler was not an innocent purchaser. He had approached Young time and again and attempted to extract this information. Young had many letters from Wheeler. He believed two of them would be useful and valuable. From time to time he mysteriously hinted at their contents. They were in the *297 possession of several lawyers and possibly others were given some knowledge of their purpose. Just before the making of the alleged contract he had a talk at the Windsor Hotel in Denver with Rucker and agreed to take the letters to Aspen, and turn them over to Judge Thomson who should show them to Rucker. His testimony about this interview is not wholly consistent nor do his statements on direct and cross-examination agree. I conclude he either fully stated the contents or stated enough of them to enable the prospective plaintiff to judge them to be valuable. Young wanted to sell and Rucker was willing to buy. Young did not trust the buyer with them prior to contract, but insisted on acting through Judge Thomson who had been, and possibly then was, his attorney in some pending matters. He agreed to give him the letters and that he might as the attorney of both submit them to the purchasers’ examination. I regard this as vital and important. Young was vendor and Rucker was vendee. Judge Thomson was an attorney, and as such, and such only, the representative of one or both of them. He was neither buyer nor seller and was without interest in the transaction save as to whatever employment or fee might come to him from the purchaser. It must be borne in mind suit had not then been brought. The essential proof had not been secured. This was to be obtained by and through these letters and Young. Young then either mailed the letters to Aspen or took them to Judge Thomson, and they were submitted for examination. A bargain was made. Young contends that Judge Thomson promised to pay him as the consideration for the agreement one half of the fee which he might receive. This was shown to be $25,000 and he sues him for one half of it. The answer admits a contract but avers it was made by Judge Thomson on Rucker’s behalf, and as his attorney, and to have been for one quarter of what the plaintiff should recover or receive on execution or settlement to be paid by him. I shall make no attempt to decide this question either from the testimony, or on the basis of probability, or on the legitimate inferences *298 •which, may be drawn from the evidence. Even if I should conclude, which I do not, that Judge Thomson contracted, I seriously question whether there was any legal consideration to support the agreement. The whole theory of the plaintiff’s case which is that of a personal contract by Judge Thomson, is to my mind completely overcome by the circumstances attendant. on the transaction, its antecedents, and the subsequent events. But in my view I need not decide the point. The case properly and legitimately turns on the terms of the agreement construed in the sunlight of the situation. These terms I shall now state, and support my view by copious citations from the testimony, preceding it by a summary of the situation which has been foreshadowed, follow it by a narrative of what was done by Young after he made his contract and then apply the law.
The situation when the contract was made: It must always be borne in mind I do not state what may be taken as absolute facts established by evidence on full hearing. Neither Thomson nor Rucker testified. I take Young’s evidence and narrate what it shows. Rucker had been negotiating with Young in his search for proof on the pivotal question of notice. He had not brought suit though it had long been in contemplation. Young had letters which he was astute enough to appreciate were wanted. Why he waited does not transpire; whether he was taking bids from both sides will probably never be known whatever we may believe about it. The talk at the Windsor resulted in some sort of a convention between Young and Rucker. This is a fair inference, else why was the agreement then made that the letters should be turned over to Judge Thomson and shown to Rucker ? This was agreed to. It was done. The contract was the natural and necessary sequence. I therefore conclude there was a preliminary contingent arrangement which was consummated by the exhibit of the letters, their surrender, and a promise of an interest in the recovery. ' I am quite indifferent as to the amount which was to be paid, and equally so, as to the individual who was to pay it, though my conviction *299 is broad and firm that the beneficiary was the obligor. The letters seemed to furnish the missing link indispensable to the forging of the complete chain. There was another proposition equally essential to Rucker’s success. In this, as in the other, Young was an important. factor. Not only must Rucker show that Wheeler knew of his equities, but he must prove a tender of the sum nominated in his bond within the time limited. This, as we gather, was to be established by one Judkins who appears to have been jointly interested in the deal. On this point Young must have been an important factor. If Judkins could alone testify to it and Young should deny it, the suit would be in danger. We have referred to this at this juncture, simply to show the significance and importance of the relation which Young sustained to the impending litigation. It explains, elucidates, and interprets the conditions, terms and character of the contract. I shall later when commenting on his subsequent conduct elaborate this consideration. Now what did Young agree to do ? What were the actual and what were the necessarily implied conditions of his agreement ?
The terms as I learn them are gathered partly from Young’s direct testimony; his language and statements, partly, are the result of legitimate inferences from what he said and what he did not say. At the outset I desire to suggest I was wholly unable to gather from the abstract the material necessary to a determination of this case. The difficulty was somewhat overcome by a supplemental abstract, but by neither singly nor by both combined, was adequate material furnished for the consideration of a controversy of this peculiar character. In cases like this the entire testimony should be printed because only from it, as actually given, can the matter be understood. We should have the answers of the witness and his answers as shaded and interpreted by the interrogatories put. All are absolutely indispensable to the formation of an intelligent and satisfactory conclusion. At the solicitation of the appellant we disregarded the general rule which would have permitted us to affirm the judgment. The appellant is *300 always bound, if he wants a ease reversed, to furnish the material on which the court can act. Under the circumstances, and having regard to the relations which I have sustained to the appellee for the' past seven years, I was unwilling on any technical basis to dispose of the controversy. I therefore accepted the request of the appellant’s counsel, made on the oral argument, and went to the record. I have read the bill of exceptions from corner to corner and have studied it thoroughly, gleaned from it the material which I deem essential to the decision, and thereon have formed a binding conviction which I shall proceed to support by citations from the testimony and by arguments based thereon.
My first inquiry is, what was the contract? Let us see what Young says it was.
“ Q. Now, before you handed the letters to Judge Thomson, what conversation had you with Judge Thomson ?
“ A. It was in relation if he could get the evidence that would prove that Mr. Wheeler was not an innocent purchaser, it was valuable to Mr. Rucker to commence a suit.
“ Q. He stated that to you, did he ?
“A. We talked that over a good many times, of course.
“ Q. Before that time ?
“A. Yes, I presume so.”
Young handed the letters to Judge Thomson and delivered them to him to use in the suit to be started against Wheeler. When he handed them to Judge Thomson, Young proceeds to state as follows :
“ A. Knowing that Mr. Rucker wanted to prove that Mr. Wheeler was not an innocent purchaser, and I thought those letters conveyed that information, and when the time came around, for a certain reason I had always kept them, had them, hadn’t allowed Mr. Rucker to get at them; I had them up to the time I met him in the Windsor Hotel and I told him then I would take them to Judge Thomson, my attorney, and give them to him, and that I thought that they were letters that were important to him in that case that he wantéd to start.”
*301 It then appears from Young’s testimony that after he took the letters to Judge Thomson they were shown to Rucker with his consent. Now we may legitimately inquire, why did he deliver those letters to Judge Thomson ? Let us see what he says.
“ Q. And you delivered them because he wanted them ?
“ A. I delivered them to Judge Thomson having an understanding with him that he would make arrangements with Rucker for an interest in that fight.
“ Q. And then the agreement, whatever agreement was made with reference to these letters, was made after these letters were delivered to Rucker ?
“A. Yes, sir.”
The suit was not begun for two or three months and probably towards the latter part of the year, but prior to that time, according to Young’s own testimony, he had negotiations and conversations with respect to the commencement of the suit. It further appears that thereafter he had frequent consultations witli Rucker with reference to the litigation. Young was to get nothing if the plaintiff failed to recover and this was his interest in the suit. His interest as he puts it, was to be one half of what Judge Thomson should receive, but in reality it was an interest based on the extent of Rucker’s recovery, because he says :
“ Q. And then you were to receive half that Thomson realized ?
“A. Judge Thomson was to divide with me, one half of what he got.”
Now let us see by the significant answer which he makes to a question put to him, whether it was the delivery of the letters alone which were the consideration for the agreement, or whether there was some other and more extensive promise which Young made, and on the basis of which he was entitled, if at all, to recover what he claims :
“ Q. Then you had an interest in one quarter of what should be realized by him for Rucker ?
“ A. Yes, sir.
*302 “ Q. And the consideration for that was the delivery of these two letters?
“A. In the main.”
It then appears, as the result of the further cross-examination of the witness on this proposition, that there was substantially an understanding and agreement, that although he was an indispensable party to the suit to be begun against Wheeler, it being to set aside a conveyance theretofore made by him to Wheeler, no judgment should be taken against him and he should go scot free. In pursuance of this arrangement, and we are justified in concluding the arrangement was made, Young employed no attorney, made no defense and no judgment was taken against him, and he practically conceded on the trial, this was the result of the antecedent understanding had at the time the letters were delivered. As Young himself puts it:
“ Q. You understood of course at that time that you were not to be hurt by this suit if you turned these letters over, didn’t you?
“ A. At that time I was in trouble with Mr. Wheeler.
“ Q. You were in trouble with Mr. Wheeler at the time, and you turned these letters over to him with the understanding that you were not to be hurt by the suit yourself ?
“ A. Yes, sir.”
We now proceed to show by his testimony that there was some other consideration than the delivery of the letters. In other words, when Young testified that “ in the main ” the delivery of the letters was the total consideration, it in reality appears he agreed to go farther and do more in Rucker’s interest than simply deliver the documents. It was not a simple sale of existing paper, but there was annexed to the sale a condition that Young should keep out of the suit, should not become a witness on the other side, nor give his version of the transaction, but should conceal whatever he knew, and lead'the other side to believe his testimony if offered would be against their interest. In other words, it was a clean-cut case of the purchase of the silence of a witness *303 as well as the buying of documentary evidence. This conclusion is the result of an examination of some affidavits about which I shall speak later, but it is significant at this juncture. Proceeding:
“ Q. Now then, you had no purpose of returning to Denver and correcting this affidavit unless they refused to pay the money ?
“A. I should have corrected that affidavit on my return to Denver anyway.
“ Q. But you would have stayed there, however, without any regard to when the motion for a new trial was to be heard ?
“A. My sickness prevented me returning. I did all I could consistently to help them along.
“ Q. Help who along ?
“ A. Rucker and Judge Thomson.
“ Q. Is that what this affidavit number two was given for, made in Colorado Springs ?
“ A. All I could do consistently, that was my idea of the truth, embodied the truth; it was overstated; that there were facts in there that I have told Judge Rucker a good many times, that had he put me on the stand that I would have to testify in the main against him, and he came to the conclusion he wouldn’t put me on the stand; it was so understood by the attorneys ; I told him that in giving those documents to him, those papers, I stepped out, I wasn’t to be put on the stand.
“ Q. You agreed to give him whatever assistance you could for the maintenance of his suit?
“ A. But not to be put on -the stand; that was my understanding.
“ Q. Now you answer my question. You agreed to give him whatever assistance you could for the maintenance of his suit?
“ A. What was reasonable, yes.
“ Q. What was reasonable.
“ A. And I did spend my money on it in traveling and dancing attendance on the case.
*304 “ Q. And that was involved in this contract for which you are now suing ?
“ A. I think not in that light exactly.”
He continually testified that he would assist them in whatever way he reasonably could, though he was to be kept off the witness stand. As he says:
“Q. Assist them what you could reasonably; now what do you mean by that?
“ A. It certainly was not financially, or anything of that kind.
“ Q. Looking up witnesses ?
“A. Simply to assist them; I was on that side of the case.
“ Q. Could you assist them in any way than the presentation of the letters and testifying yourself to the fact that a tender had been made, and a deed refused ?
“ A. I judge I could have assisted them by keeping off the stand; certainly the way he looked upon it, the way Judge Rucker looked upon it after he found out what I would testify to; he didn’t want me to go on the stand and said so.”
This was Young’s understanding. That it was his purpose, anc] that he carried out his contract is plainly apparent from what he subsequently says. When he was being examined by his own counsel in order to make an explanation of all this dangerous and enlightening testimony, gloss it over and conceal the iniquities of it and of its purposes and objects, he proceeds:
“Q. You may state whether or not after that suit was brought here in Denver you were requested by Mr. Thomson to be present at interviews and consultations of counsel and parties had for the purpose of carrying that suit on.
“A. Yes, sir.
“Q. You may state whether or not that occurred from time to time from the commencement of the suit up to the first trial of the case.
“ A. It did, at different places. I met Judge Thomson very frequently and we consulted; I met them in his office *305 with the other attorneys and knew a good deal about the case ; gave what little assistance I could, hr a way perhaps which wasn’t much but was all I could do to help Rucker.”
That Young really was hired to aid in the suit, to furnish information as well as to deliver the letters, and to put himself in such a relation to the plaintiff and his side of the controversy that the defendant could not call him as a witness to testify on any of the pivotal facts, is plainly apparent, for on the redirect examination he says :
“ Q. You may state, Mr. Young, to what extent your time was taken up and consumed from the time of the institution of this suit up to the first trial of it, by the attendance on the counsel in the- interest of this suit of Rucker against Wheeler, — in the interest of this plaintiff in the suit of Rucker against Wheeler. ”
Now this is a question put by his own counsel on redirect examination for some inscrutable reason which is quite beyond my apprehension. If the contract was simply the legitimate thing, for which counsel now contend, a sale of documents, of what value this inquiry ? If, on the other hand, it went farther and showed more and the purpose of counsel was to show an added consideration, I can conceive its propriety, though the danger of it is instantly apparent to one who has examined the question of the invalidity of contracts because against public policy and good morals. It seems to me counsel overshot the mark when he put the question. The answer is:
“A. Well, I don’t know; I was in Tucson on business and I had to put in an appearance here, to be here ready when that case was tried; I made one or two trips from Arizona here on that account; I certainly was in attendance all the time; it is hard to tell.
“ Q. You may state whether or not during that period of time you remained here rather than go to the portions of the country where your business called you, for the purpose of aiding and assisting in the conduct of this suit as far as you could.
*306 “ A. I did.”
This is a damaging disclosure of Young’s relations to the 'suit and shows they were far different from that which would be occupied by one who was simply selling documentary evidence and whose interest ceased when the documents were delivered. Manifestly, the consideration was not alone the delivery of the letters, but it was the assistance which Young was to render the plaintiff in the progress of the litigation. It may be, but I am not prej)ared to say, the evidence establishes the proposition that Young was not to go on the stand and testify. I am quite of the opinion it was never the purpose to use him as a witness. It is demonstrated by the affidavit hereafter referred to, if the affidavit be true as we must assume against Young, that his evidence would have been against the plaintiff’s interest on one of the principal propositions which he was bound to establish, to wit, the fact of the tender. It was included in, and it was a part of, the contract that Young should aid the plaintiff’s suit by withholding the evidence which he might give on a proposition, which being determined one way or the other, would decide it. If the contract was not to purchase Young’s testimony, as well as the documents, it was a contract to suppress his testimony as well as to deliver letters. I do not intend to say the evidence shows there was any such contract or agreement with Judge Thomson, or that he had any knowledge of what Young’s testimony would be on this pivotal proposition because Young does not so testify. But I do insist it is a fair, reasonable and legitimate inference, and in fact an irresistible conclusion to be drawn from Young’s testimony that he had this understanding with the plaintiff and that it was part of his agreement no matter where or when it was made. Whether this is a fact I do not know. I simply conclude the testimony show's it was a part of the contract and this vice is the destroying element. Whether this understanding was had at the time of the original conversation at the Windsor Hotel when the first talk was had about making the arrangement, or after the letters were shown to the plaintiff, *307 or where it was had, or with whom, is utterly unimportant and immaterial so long as the conclusion remains that the understanding was had, and was a fundamental part of the arrangement. That this was an indispensable part of it, and that it must have been made, is quite easily discoverable from a consideration of Young’s subsequent conduct with reference to this litigation. His position in the matter is past reasonable comprehension. According to his evidence he sold the letters to enable the plaintiff to maintain his action. That was the principal purpose of the arrangement. He also agreed to render what assistance he could to further the plaintiff’s interests during the progress of the suit. He attended various conferences of the attorneys. He came from Arizona to be present at the trial to give his aid and to impress the defendant with the idea that he was one of the leading spirits in the litigation and that he must not be put on the stand by him. He stood in this position until judgment was obtained. When Rucker once had judgment we find him ready to dicker with the other side, barter the knowledge which he had for use in those judicial proceedings. He was ready to sell what be knew and to state the facts to which he would have been compelled to testify on the original trial, if we assume him to be a truthful man, had he been put on the stand either by the plaintiff or defendant. We may be certain he would have been called by the defendant, he being otherwise without evidence, had Young not assumed the position under the terms of his contract that he was hostile to him. He was acting in the interest of the plaintiff, thereby as he says “ rendering what assistance he could.” According to his affi davit he was suppressing the truth. This was certainly the most valuable assistance he could render. It may be, and I am quite willing to concede, Young did not agree to testify falsely, but he evidently did agree to put himself in a position to prevent the discovery of the truth. I put it in this way not to attack the original judgment, which of course, must have been based on a finding contrary to Young’s statement, nor on the theory or *308 hypothesis that Young’s statement with reference to this proposition was of necessity true and the plaintiff’s contention false. It is not for that purpose nor to that end. Nor do I assume the fact to be as he stated, nor as stated by him in the affidavit. I simply assume that the fact is as Young states it for the purposes of this opinion and for the purposes of his suit; in other words, I assume it against Young who is in no position to deny it. According to him neither Rucker nor Judkins on the 19th of November made any tender of the money due on the bond whereby and where-under they acquired a right to the conveyance. How is this to be demonstrated? Simply by Young’s affidavit. This paper is to my mind of great significance in determining the •character of tins suit, in determining the nature of Young’s relation to the litigation between Rucker and Wheeler, the attitude he occupied, the purpose he had in making the contract and in ascertaining its scope. The verbal contract is to be construed and understood in the light of these subsequent proceedings.
Immediately on the conclusion of the suit Young proceeded to dicker with the other side. He owed Wheeler $55,000 under some arrangement between Hagerman and Wheeler whereby Wheeler had acquired Young’s obligations or assumed to pay his debts. Out of what these debts sprung we have no knowledge, but we do know a large amount of either paper or unsecured debts were outstanding. After judgment he saw a chance to deal with Wheeler, get rid of these debts and still let his contract with Rucker stand. In this way whoever succeeded, whether the plaintiff or defendant, Young stood to win. He has already made a contract for one fourth of Rucker’s recovery. It might be the judgment would not be sustained. To make sure that he would not lose, Young starts to trade with Wheeler. We do not intend in any way to intimate that this trade was made directly with Wheeler because it seems not to be true. It was done through an intermediary and apparently at the instance, and under the promise of an attorney. The attention of the parties seems *309 to have been attracted by a letter. To show the character, purpose and nature of the proceedings of this extraordinary person in the barter of his testimony, we must give a history of the latter. One Martin, who was some connection of Young’s, wrote a letter intimating what Young’s testimony would be witli reference to the tender made on the 19 th of November, 1884. This letter was concocted by Martin and Young, Young copied it, as though it had been devised and written by him, directed it to Martin and sent it. When Deane came to Young to find out what the facts were respecting this matter, for Young had evidently been talking about it, it was suggested there was a letter outstanding which would show the facts and would answer the purpose. The letter was léft lying around by Martin, seized by Deane, delivered to the attorney and this immediately begot negotiations with Young with reference to the proof. Young then agreed in consideration of the release of this $55,000 of indebtedness and the payment of what money was necessary for his immediate expenses, to furnish proof tending to show that neither Judkins nor Rucker had ever made him any tender. Young went to Colorado Springs and met the attorney and made the affidavit. I should like very much to exhibit this affidavit in its entirety, but unfortunately the limits of a judicial opinion will not permit it. I must state some pivotal parts of it because they throw so much light on what has been antecedently stated with reference to Young’s relations to the suit, and with reference to the nature and character of his promises. Therein he states he talked with counsel for the defendants before the trial, and admonished him not to put him on the stand because his evidence would not aid his cause. This demonstrates Young attempted to carry out his contract with the plaintiff to render him what assistance he could. What this assistance was we shall see. The affidavit then proceeds that Young had concluded he ought to make a statement in regard to the alleged tender and to state that Judkins did not see him until the evening of the 19th day of November. In the conversation then had *310 Judkins stated that he had walked to Aspen in order to take up the bond, whereupon Young inquired whether he had the money “ in his jeans ” to take it up. He said he had not, but could get it; that he thought he might take it up on the 20th, but he wanted an extension, which was refused. He thereupon, according to this affidavit, went away without saying anything definite and made Young no offer of money, and Young made no refusal. Young further says that he made no tender on the 20th; would not even say that he had the money nor did Young tell him that he need not produce any, but only said the time had expired and he was under no obligation to make a deed. “ He further stated in this affidavit that he made no defense, and pleaded none because it was agreed between plaintiff and his counsel and affiant that he need not do so, and nothing would be claimed against him. This remarkable affidavit is followed by another to which I shall only briefly refer as it does not bear on the main proposition but only concerns the attempt made by Young to make some sort of an explanation of the other statements and furnish an apparent reason for making the affidavit in opposition to his agreement. I only refer to it because it contains one or two matters which are significant. In the second affidavit Young states he was assured before he made the other that the attorney and the parties would furnish him sufficient money for his present needs, and have the obligation to Wheeler canceled. It also appears therein he asked the attorney whether the promise of the intermediary would be good, but the attorney declined to talk about it, simply telling him that it would be all right. He says he found that the attorney imposed on him in making the affidavit, making it stronger than he had authorized him to do. He telegraphed and wrote frequently to Martin and his brother, requesting them to see the attorney and insist on his doing as he had agreed. He telegraphed other parties who were interested in the arrangement to place money to his credit in the bank. I am utterly unable to find anything in the second affidavit which in any wise either attacks or discredits or weakens *311 the force of the statements of the other respecting the terms and conditions of the alleged tender. This is denied as much by one as the other, and the only reason for making the second affidavit seems to be the failure of the parties to place money in the bank for the relief of Young’s necessities. This is exhibited by a letter which appears in the abstract written to the appellant’s attorney in the present suit from Tucson, Arizona. In it he attempts to explain the reason why he made the affidavit contrary to the terms of the arrangement theretofore made. Probably this letter was written because the appellant’s present attorney was one of the representatives of the plaintiff in the suit against Wheeler. In this letter he admits his folly in making the affidavit, but he says he thought the whole thing was as good as settled, and they would not be able to use what he therein stated with reference to the terms and conditions of the tender. In other words, he thought he had made a contract with the plaintiff whereby he would get one fourth of his judgment. He believed he could make this affidavit on an agreement with the defendant to release a debt amounting to $55,000 and current funds for present necessities. In the letter he says it looks like they would get a new trial, but if so, they must put him on the stand, instead of taking a deposition which would put them in a worse fix than ever. He then proceeds to intimate a way by which the plaintiff can avoid the disaster Avhich might follow from his appearance as a witness. He states that he is down in Arizona sketching, and liable to be in Mexico or some out of the way place, where they could not find him. He wanted the attorney to talk it over with the other attorneys, force the matter to an immediate hearing, that he may be out of the way so that the defendant cannot procure his testimony. The whole object and purpose in stating these affidavits and this letter is simply to demonstrate that from the inception to the end Young simply occupied the position of a trafficker in testimony, a trafficker in knowledge and a trafficker in documents for either side, one or the other, as the case might be for whatever gain, benefit or ad *312 vantage he might be able to get. It would really appear from the tenor of a part of his cross-examination he had negotiations with other parties looking to an arrangement whereby he could work either the one side or the other. These circumstances and these events warrant me to put upon what he has said, as well as upon what he has omitted to say, the construction, and warrants me to derive therefrom the inference which I' do unhesitatingly draw, that Young had the purpose and made a contract to do more and other than simply sell th'e letters which he turned over to the plaintiff. I have no doubt he sold the letters, and I am equally confident he did agree that he would conceal and suppress whatever he knew about the case which would be prejudicial to the plaintiff’s interests, and that he would put himself in such an attitude with reference to the cause that the defendant would not dare put him on the stand. The far-reaching scope of the arrangement is evident to any lawyer who has ever tried a case. Whether there was or was not a tender of the money was -a matter within the knowledge of two people and two only, Judkins and Young. Judkins testified that the money was tendered, or that Young did that which relieved him from the necessity to make a tender. The plaintiff, the other part of his ease being established, must recover. Manifestly, the defendant was without evidence save as he might cross-examine Judkins or put Young on the stand. It was, therefore, absolutely indispensable that Young should not only deliver .these letters but that he should assume an attitude and make statements to the defendant and his representatives which would deter them from calling on him as a witness. In this way he was not bound to testify falsely; he need but to conceal the truth. This was as available, as useful, as valuable, as his testimony would have been. According to the affidavit this is precisely what he did: told the attorney not to call him, consulted with the plaintiff and his attorneys, allied himself with that side of the suit, and was called as a witness for the plaintiff. The object was accomplished, the result was definite. It *313 was what ought to have been expected. It would have been an absolute certainty but for the affidavit and the letter which probably ultimately compelled a settlement. Martin wrote the letter which Young copied which led to the negotiations with the defendant’s attorney. He made an affidavit directly against his contract and against the plaintiff’s interests. For what? The release of $55,000 of debts and a promise of money for his immediate necessities. To this he testifies and we find that immediately thereafter he was both writing and telegraphing to the defendant’s attorney, to the party who formerly held the debts against him, and to his brother-in-law to get money and put it in the State Bank for his use.
I have proceeded with great and unusual labor, which is perhaps not wholly inexcusable, in stating the testimony which warrants the inferences I have drawn and in framing the arguments which can be legitimately based on it and on the case as the plaintiff made it. It is beyond question that Young made a contract not only to deliver the letters but also to suppress evidence and assume a position in relation to the case which should retard if not forbid the production of his testimony. If such a contract can be sustained on the theory of a legal right to sell documents, then we have misread the law. The sale of testimony has always been inhibited. No contract which has for its purpose, or for a part of its purpose, the delivery of testimony is enforcible in any court. I am of the opinion that a contract which has for one of its objects and one of its purposes the suppression of testimony is as much within the rule and the principle laid down by the cases as is the other. Contracts of this sort are not only condemned by all reputable practitioners, but are shocking to all moralists and should be inhibited by all legislatures. I may be permitted gravely to question whether it would not be wise and expedient for our lawmaking body to enact a statute akin to the rule which prevailed at the common law with respect to the testimony of parties in interest, which should absolutely exclude a witness from the stand or *314 forbid the consideration of his evidence by a jury on any subject, and in any case, where he testifies for a fee or a reward,- and it is not necessary to determine whether or not a crime had been committed or to decide the nature of a personal injury or the mental condition of an individual. I conceive strong and irrefragable arguments could be adduced in sup-' port of the proposition, as one which tends to the preservation of the purity of the fountains of justice, and of judicial proceedings, and in the end must tend to the preservation of the rights of litigants to the betterment of society and to the good of the comnmnity. It is not the law, but I find enough in the books to permit me to condemn this contract and deny the plaintiff a right to recover.
Though I have examined every case to which attention has been called in the briefs of counsel and every case which has been referred to in the opinions of the courts wherein the question has been considered, I have been unable to find one exactly parallel to the present. None has been found, and yet in all there are stated principles which to my mind are conclusive. As Lord Mansfield said, “ many contracts which are not against morality are still void as being against the maxims of sound policy.” It may be said that all contracts which have for their object the production or delivery of evidence are closely scrutinized and unless it is found on examination that they are just and equitable and tend to the promotion of the ends of the law, they cannot be upheld. No general principle can be advanced on the subject because of the variety of the forms which fraud assumes, but as was well said by a learned justice, “ No claim founded in bad faith, in moral turpitude, in deception upon the public, or a third person, or in fraud practiced by one contracting party on the other, can constitute a good cause of action ; and that whenever such a claim makes its appearance in a court of justice, the law, ever watchful of public morals and private right, is sure to defeat the dishonest scheme, either by exerting its power or withholding its aid.” This is a strong, sound, terse and satisfactory expression of the principle *315 which is determinative of the plaintiff’s rights. The claim is founded in bad faith. Within its terms are to be found an agreement to withhold evidence respecting the truth of the controversy. It is a fraud practiced on a third person, to wit, on the defendant in that suit by the suppression of this testimony, assuming as we must, as against the appeh lant, the truth of that statement, though we do not assume it as against the parties to the suit. When the testimony in this record is submitted to the scrutiny with which such contracts must be viewed by courts of justice, it cannot be concluded that the contract was just or equitable or tended to the promotion of the ends of the law, and it must therefore be adjudged void as against public policy and good morals. Oscanyan v. Arms Co., 108 U. S. 262; Chippewa, etc., Co. v. Chicago, etc., Co., 75 Wis. 224; Barnett v. Spencer, 4 Blackf. 206; Lathrop v. Amherst Bank, 9 Met. 489; 2 Story’s Eq. § 1049; Burt v. Place, 6 Cowen, 430; Lucas v. Allen, 80 Ky. 681; Thomas v. Caulkett, 57 Mich. 392; Kreamer v. Earle, 91 Cal. 112; Valentine v. Stewart, 15 Cal. 387; Browne v. Bigne, 21 Ore. 260; Boardman & Browne v. Thompson, 25 Ia. 487; Thompson v. Reynolds, 73 Ill. 1; Lyon v. Hussey, 31 N. Y. Supp. 281; Quirk v. Muller, 14 Mont. 467; Cobb v. Cowdery et al., 40 Vt. 25; Hoyt v. Macon et al., 2 Colo. 502.
A good many other cases might be cited which bear more or less directly on the proposition. These are enough to illustrate and support the theory on which all the cases rest and the consideration by which such controversies are determined. It may be laid down as a general proposition that where the tendency of a contract is to promote unlawful acts it is illegal and against the policy of the law without regard to circumstances indicating that the promisor will perform acts which are unlawful. The undoubted tendency of this contract and its probable terms were to suppress testimony. Its tendency was therefore necessarily illegal and immoral. Young if put on the stand might not have testified falsely. Yet the contract might have persuaded him not to tell the *316 whole truth and thereby he would have defeated the ends of justice. The contract then manifestly tended to promote an unlawful act and though the act may not have been committed, and even though we are inhibited perhaps from assuming that it either would have been committed or that its commission was probable, yet since the tendency of the contract was illegal it is void as against the policy of the law. From the earliest times such contracts have been condemned. The matter of public policy is not perhaps the same at all times and in all ages and may vary with the growth of society and be changed by the habits of the people and by the growth of commerce. Whatever may be the opinion respecting the extent to which the courts ought to go in adjudging a contract void as against public policy and as made in contravention of the law, I hope it may never become true in the history of our country and our people that parties to a litigation may make a contract for the delivery of documentary evidence and couple therewith either an agreement or an understanding, that parties shall pursue a course of conduct which may result in the suppression of testimony and prevent a fair and full investigation by the production of the testimony of all witnesses who may have knowledge. Whatever tends to this end is destructive of the best interests of society. It ought to be condemned and courts should be astute to discover means to defeat such frauds, condemn them wherever found and prevent recovery by those who would profit by such practices.
As established by the testimony we believe that this contract is within the scope and purview of even the plainest principles established by these numerous cases. The contract was tainted and even though I should find he had made it precisely as he has alleged it, and precisely -as he testified to it, I should still find regardless of the inferences which I draw from his evidence, that the tendency of his contract .was to promote unlawful acts, and that this tendency renders it illegal and against the policy of the law, and that the courts ought not to enforce it.
*317 The judgment of the court below accords with this opinion and I therefore believe the judgment should be affirmed.

Affirmed.